**Donald E. MONTRYM, Individually and in behalf of all others similarly situated,**

v.

**Robert A. PANORA, Registrar of Motor Vehicles, and his successors in office.**

Civ. A. No. CA 76–2560–F.

United States District Court, D. Massachusetts.

March 25, 1977.

Robert Hagopian, Cambridge, Mass., for plaintiff.

Steven A. Rusconi, Asst. Atty. Gen., Boston, Mass., for defendant.

## OPINION

Before CAMPBELL, Circuit Judge, and TAURO and FREEDMAN, District Judges.

FREEDMAN, District Judge.

Plaintiff, Donald E. Montrym, brings this suit, pursuant to 42 U.S.C. § 1983 and 28 U.S.C. § 1343(3), on behalf of himself and others similarly situated, challenging the constitutionality of the Massachusetts implied consent statute, M.G.L. c. 90 § 24(1)(f). That statute provides for an automatic ninety-day suspension of one's driver's license for refusal to take a chemical test or analysis of one's breath after having been arrested for operating a motor vehicle on a public way while under the influence of intoxicating liquor.[1] A three-judge court has been convened to hear this case in accordance with 28 U.S.C. §§ 2281 and 2284.[2]

Plaintiff contends that the statute violates due process because it fails to provide any type of hearing or procedure whereby a licensee may respond to the state's assertion that he has refused to take a chemical test before his license is suspended by the Registrar of Motor Vehicles. Plaintiff now moves for a partial summary judgment[3] declaring M.G.L. c. 90 § 24(1)(f) unconstitutional on its face and/or as applied as well as an injunction against its enforcement.[4] For the reasons set forth below we hold that the Massachusetts implied consent statute violates due process and therefore grant plaintiff's motion for partial summary judgment and injunctive relief.

### Facts

On May 15, 1976, at approximately 8:15 p. m., the plaintiff, while driving his station

---

1. M.G.L. c. 90 § 24(1)(f) states:

   Whoever operates a motor vehicle upon any way or in any place to which the public has right of access, or upon any way or in any place to which members of the public have access as invitees or licensees, shall be deemed to have consented to submit to a chemical test or analysis of his breath in the event that he is arrested for operating a motor vehicle while under the influence of intoxicating liquor. Such test shall be administered at the direction of a police officer, as defined in section one of chapter ninety C, having reasonable grounds to believe that the person arrested has been operating a motor vehicle upon any such way or place while under the influence of intoxicating liquor. If the person arrested refuses to submit to such test or analysis, after having been informed that his license or permit to operate motor vehicles or right to operate motor vehicles in the commonwealth shall be suspended for a period of ninety days for such refusal, no such test or analysis shall be made, but the police officer before whom such refusal was made shall immediately prepare a written report of such refusal. Such written report or refusal shall be endorsed by a third person who shall have witnessed such refusal. Each such report shall be made on a form approved by the registrar, and shall be sworn to under the penalties of perjury by the police officer before whom such refusal was made. Each such report shall set forth the grounds for the officer's belief that the person arrested had been driving a motor vehicle on any such way or place while under the influence of intoxicating liquor, and shall state that such person had refused to submit to such chemical test or analysis when requested by such police officer to do so. Each such report shall be endorsed by the police chief, as defined in section one of chapter ninety C, or by the person authorized by him and shall be sent forthwith to the registrar. Upon receipt of such report, the registrar shall suspend any license or permit to operate motor vehicles issued to such person under this chapter or the right of such person to operate motor vehicles in the commonwealth under section ten for a period of ninety days.

2. The complaint in this case was filed prior to the effective date of Public Law 94-381, repealing 28 U.S.C. § 2281 and amending 28 U.S.C. § 2284. The new statute would make it unnecessary to convene a three-judge court to enjoin the enforcement of a state statute of the type involved in the present action on the ground of its unconstitutionality.

3. Plaintiff also seeks individual compensatory and punitive damages as well as reasonable attorneys' fees. The court expressly reserved judgment on the damages issue pending a decision on the merits.

4. Plaintiff has already obtained a restraining order issued by a single member of this court prior to the convening of the three-judge court. That order, dated July 9, 1976, enjoined the defendant from revoking the plaintiff's driver's license on account of his alleged failure to take a breathalyzer test in accordance with the statute until further order by the court. There has been no such further order prior to this decision.

wagon upon a public way in the Town of Acton, was involved in a collision with a motorcycle. At approximately 8:30 p. m., the plaintiff was arrested by an Acton police officer and charged with operating under the influence of intoxicating liquor, driving so as to endanger the lives or safety of the public, and failing to have the motor vehicle registration in his possession. The police officer issued a citation to the plaintiff pursuant to M.G.L. c. 90 § 1. The plaintiff was then brought to the Acton police station where he declined a police request to take a breathalyzer test. He alleges he was not informed that his license would be suspended upon such refusal. The police officer's Report of Refusal to Submit to a Chemical Test (Report) lists the time of refusal as 8:45 p. m. There is some question as to what next transpired. Plaintiff asserts that he subsequently requested and was wrongfully denied an opportunity to take the test.[5] The Report makes no mention of this. In any case, it is agreed that no test was administered.

On May 25, 1976, the defendant Registrar of Motor Vehicles of the Commonwealth of Massachusetts, Robert A. Panora, received the Report from the Acton police. The Report was made on the form approved by the Registrar which complied with the statutory requirements of M.G.L. c. 90 § 24(1)(f).[6]

On June 2, 1976,[7] a hearing was held in the appropriate state district court on a criminal complaint alleging the three offenses. The driving under the influence charge was dismissed. The plaintiff was found not guilty on the driving to endanger charge and guilty on the registration charge for which he was fined $15.

On the same day, June 2, 1976, plaintiff's attorney wrote the Registrar requesting a stay of any possible action that might be taken with respect to the plaintiff's license. This letter was received by the Registrar on June 3, 1976. Nevertheless, on June 7, 1976, the defendant Registrar suspended the plaintiff's driver's license on the basis of its receipt of the Report as required by M.G.L. c. 90 § 24(1)(f). On June 11, 1976, the Registrar responded to the plaintiff's attorney's letter of June 2, 1976 and informed him that plaintiff's license had already been suspended.

On June 7, 1976, plaintiff's attorney wrote the Board of Appeal on Motor Vehicle Liability Policies and Bonds for a hearing pursuant to M.G.L. c. 90 § 28,[8] stating

5. In support of this assertion, plaintiff points to an ambiguous statement presumably made by the state court on the face of the complaint that the breathalyzer test was "refused when requested" within one-half hour of the plaintiff's arrival at the police station. However, the present action does not require us to determine either the significance or exact meaning of that statement.

6. *See n. 1, supra.*

7. Although the complaint refers to June 8, 1976 as the date of trial in state court, the documents submitted and agreed to by both parties, including a dated photocopy of the dismissal of the first charge, as well as the chronological order of subsequent events, leads to the logical conclusion that the trial did in fact occur on June 2, 1976.

8. M.G.L. c. 90 § 28 provides:
Any person aggrieved by a ruling or decision of the registrar may, within ten days thereafter, appeal from such ruling or decision to the board of appeal on motor vehicle liability policies and bonds created by section eight A of chapter twenty-six, which board may, after a hearing, order such ruling or decision to be affirmed, modified or annulled; but no such appeal shall operate to stay any ruling or decision of the registrar. In the administration of the laws and regulations relative to motor vehicles, the registrar, or any person by him authorized, may summon witnesses in behalf of the commonwealth and may administer oaths and take testimony. The board or the registrar may also cause depositions to be taken, and may order the production of books, papers, agreements and documents. Any person who swears or affirms falsely in regard to any matter or thing respecting which an oath or affirmation is required by the board or the registrar or by this chapter shall be deemed guilty of perjury. The fees for the attendance and travel of witnesses shall be the same as for witnesses in civil actions before the courts, and shall be paid by the commonwealth upon the certificate of the registrar filed with the comptroller. The supreme judicial or superior court may, upon the application of the board or the registrar, enforce all lawful orders of the board or the registrar under this section.

that he had not refused to submit to a breathalyzer test within the meaning of M.G.L. c. 90 § 24(1)(f). This letter was received by the Board of Appeal on June 8, 1976. Plaintiff surrendered his driver's license, as required, to the Registrar on June 8, 1976.

On June 10, 1976, plaintiff's attorney received a reply from the Board of Appeal, dated June 8, 1976, which requested plaintiff to complete certain enclosed forms in duplicate. The forms were completed and mailed back to the Board on the same day. They were received by the Board on June 11, 1976. On June 24, 1976, the Board of Appeal notified plaintiff that he could have a hearing on July 6, 1976.

On June 28, 1976, plaintiff, by his attorney, demanded the return of his driver's license from the Registrar on the basis that the state court had allegedly made a "specific finding on the face of complaint that the police refused to give Mr. Montrym a breathalyzer test after he requested one," that he was "acquitted" of driving under the influence of intoxicating liquors, and that suspension of his license "without affording him a prior hearing is a patent deprivation of his liberty and property without due process . . . in contravention of the Fourteenth Amendment of the United States Constitution."

Although the Registrar refused this demand, Mr. Montrym's license was returned on July 15, 1976 pursuant to an order issued by a single member of this court on July 9, 1976.[9]

### Conclusions of Law

The state may not confiscate one's driver's license without affording the licensee procedural due process. *Bell v. Burson*, 402 U.S. 535, 539, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971); *Raper v. Lucey*, 488 F.2d 748 (1st Cir. 1973); *Pollard v. Panora*, 411 F.Supp. 580 (D.Mass.1976). However, due process is a flexible concept. *Mathews v. Eldridge*, 424 U.S. 319, 334, 96 S.Ct. 893, 47 L.Ed.2d

18 (1976); *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972); *Cafeteria & Restaurant Workers Local 473 v. McElroy*, 367 U.S. 886, 895, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961). "A procedural rule that may satisfy due process in one context may not necessarily satisfy procedural due process in every case." *Bell v. Burson, supra*, 402 U.S. at 540, 91 S.Ct. at 1590. The question which thus remains in the present case is what process is due. *Morrissey v. Brewer, supra*, 408 U.S. at 481, 92 S.Ct. 2593.

In *Bell v. Burson, supra*, the Supreme Court held that Georgia's Motor Vehicle Safety Responsibility Act violated due process. The statute required the suspension of the driver's license of an uninsured motorist involved in an accident unless he posted security to cover the amount claimed by an aggrieved party. There were several statutory exceptions. No suspension would occur if, prior to suspension, either the injured party executed a release from liability or there was an adjudication of nonliability. Either occurrence would also lift a suspension once it had been imposed. However, the hearing which was provided prior to suspension excluded consideration of the motorist's fault or liability for the accident. The Supreme Court concluded that:

[s]ince the statutory scheme makes liability an important factor in the State's determination to deprive an individual of his licenses, the State may not, consistently with due process, eliminate consideration of that factor in its prior hearing.

*Id.*, 402 U.S. at 541, 91 S.Ct. at 1590.

In considering what process was due, the Court rejected Georgia's argument that a post suspension hearing would be sufficient.

[I]t is fundamental that except in emergency situations (and this is not one) [footnote omitted] due process requires that when a State seeks to terminate an interest such as that here involved, it must afford "notice and opportunity for hearing appropriate to the nature of the case" *before* the termination becomes ef-

---

9. This order was issued prior to the convening of the three-judge court. *See n. 4, supra.*

fective. [Citations omitted; emphasis in original.]

*Id.* at 542, 91 S.Ct. at 1591.

Other federal courts have applied the *Bell* decision to facts similar to those presented here. In *Holland v. Parker*, 354 F.Supp. 196 (D.S.D., C.D.1973), and *Chavez v. Campbell*, 397 F.Supp. 1285 (D.Ariz.1973), three-judge courts held the South Dakota and Arizona implied consent statutes to be unconstitutional because they failed to provide a pre-suspension hearing.[10] While recognizing a public interest in keeping drinking drivers off the road, the courts concluded that the automatic suspension of one's license for failure to take a breathalyzer test did not further this goal since "a drunk who takes the breath test continues to drive and keeps his license, while a driver who may be completely sober, and who refuses to take the test finds himself excluded from the highways." *Chavez v. Campbell, supra* at 1288. Both courts rejected the argument that the situation presented was an emergency or so extraordinary as to justify postponement of due process. Both courts noted that the license of a driver who had submitted to a chemical test and was ultimately convicted of driving while under the influence of intoxicating liquor would not have been suspended until he had been afforded a full trial. This was found to militate against the contention that summary license suspension was "necessary to facilitate immediate removal of drunks from the road." *Id.; accord, Slone v. Kentucky Department of Transportation*, 379 F.Supp. 652, 657 (E.D.Ky.1974) (single judge striking down Kentucky implied consent statute), *aff'd on other grounds*, 513 F.2d 1189 (6th Cir. 1975).

The defendant argues that *Holland* and *Chavez* are inapposite to the present case

for two reasons. First, those decisions were rendered prior to the Supreme Court's decision in *Mathews v. Eldridge, supra*. And second, the interest presently asserted by the Commonwealth is not only in removing drinking drivers from its roads, but is also in obtaining the results of the breathalyzer test for valuable use as evidence to aid in convicting those charged with driving while under the influence of intoxicating liquor. We do not find either of these distinctions persuasive enough to require us to reach a different result than that reached in *Holland* and *Chavez*.

In *Mathews v. Eldridge, supra*, the Supreme Court reaffirmed the validity of *Bell v. Burson*, at least on its facts.

> . . . *Bell v. Burson* . . . held, in the context of the revocation of a state-granted driver's license, that due process required only that the prerevocation hearing involve a probable-cause determination as to the fault of the licensee, noting that the hearing "need not take the form of a full adjudication of the question of liability."

*Id.*, 424 U.S. at 334, 96 S.Ct. at 902.

In *Eldridge*, the Court held that due process did not require a pretermination evidentiary hearing prior to the cessation of disability benefits under the Social Security Act, 42 U.S.C. § 423. It must be emphasized, however, that the plaintiff in the present action is not asserting a right to a pre-suspension evidentiary hearing. He merely seeks the opportunity, prior to the suspension of his license, to respond to the three issues which he is entitled to raise at a post-suspension hearing before the Registrar: (1) Was there probable cause for arrest? (2) Was there an arrest? (3) Did the person so arrested refuse to submit to a chemical test? See M.G.L. c. 90 § 24(1)(g).[11]

---

10. Several state courts have, however, reached a contrary conclusion, holding that the failure to provide a pre-suspension hearing did not render a state implied consent statute unconstitutional. *E. g., Jones v. Schaffner*, 509 S.W.2d 72 (Mo.1974); *Daneault v. Clarke*, 113 N.H. 481, 309 A.2d 884 (1973); *Popp v. Motor Vehicle Department*, 211 Kan. 763, 508 P.2d 991 (1973). *Cf. Broughton v. Warren*, 281 A.2d 625

(Del.Ch.1971). *But cf. Gargagliano v. Secretary of State*, 62 Mich.App. 1, 233 N.W.2d 159 (1975).

11. The parties apparently agree that a licensee may receive an immediate hearing before the Registrar upon turning in his license to the Registrar. He may also be represented by an attorney at such a hearing. If, upon examina-

Although the precise issue presented in the instant case is thus different than that in *Eldridge*, the standards set forth in *Eldridge* are applicable. In *Eldridge*, the Court stated that:

[O]ur prior decisions indicate that identification of the specific dictates of due process generally requires consideration of three distinct factors: first, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. See, *e. g., Goldberg v. Kelly, supra,* 397 U.S. 254, at 263–271, 90 S.Ct. 1011, at 1018–1022, 25 L.Ed.2d 287.

*Id.* at 334–35, 96 S.Ct. at 903.

Applying the three-pronged test to the present case, we conclude that the Massachusetts implied consent statute does not satisfy due process. The first factor to consider under this analysis is the private interest that is affected. In the present action the plaintiff's interest is in possessing a valid driver's license and the attendant right to operate a motor vehicle on a public way in Massachusetts. Little discussion is necessary to establish the importance of mobility in our society. According to the uncontroverted affidavit of the plaintiff, possession of a driver's license is essential to his livelihood. Moreover, an individual who has been erroneously deprived of his license can not be fully compensated for its loss by subsequent corrective administrative action. *Cf. Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct.

1011, 25 L.Ed.2d 287 (1970). In contrast, the Supreme Court in *Eldridge* found that a recipient whose Social Security disability benefits had been wrongfully terminated could be completely compensated retroactively. *Cf. Arnett v. Kennedy,* 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974).

In considering the second factor set forth in *Eldridge,* the defendant contends that the risk of erroneous suspension under existing procedures is minimal in view of the statutory requirements concerning the preparation of the Report of Refusal to Submit to a Chemical Test. Under M.G.L. c. 90 § 24(1)(f), the Report must be written on a form approved by the Registrar, sworn to under the penalties of perjury by the officer to whom the refusal was made, endorsed by a third person who witnessed the refusal, and also endorsed by the police chief. The police officer preparing the Report must state the grounds for his belief that the person arrested had been driving a motor vehicle on a public way while under the influence of intoxicating liquor and that such person refused to submit to a chemical test when requested to do so. Despite these precautions, errors, clerical or otherwise, could occur. *Slone v. Kentucky Department of Transportation, supra; cf. Reese v. Kassab,* 334 F.Supp. 744 (W.D.Pa.1971). Since plaintiff is not demanding a full evidentiary hearing, the provision of some kind of additional pre-suspension procedure designed to protect against such errors would be minimal, particularly in comparison to the magnitude of harm which the licensee would suffer as a result of an improper suspension. In contrast perhaps to the allowance of a full pre-suspension evidentiary hearing, the mere provision of an opportunity to respond to the police assertions con-

tion of the Report of Refusal to Submit to a Chemical Test, the hearing officer finds it to be incomplete or improperly completed, the license may be immediately returned. If a hearing is held, it must be limited to the three issues stated. A negative finding on any of these issues results in reinstatement of the license. Witnesses may be presented by either the police or licensee in this post-suspension hearing. However, if such questioning is re-

quested by either side, or further investigation is necessary, the hearing may be postponed until such witnesses are available or investigation has been completed. The license remains suspended during such postponement.

A licensee may appeal an adverse decision of the Registrar to the Board of Appeal on Motor Vehicle Liability Policies and Bonds under M.G.L. c. 90 § 28, n. 8, *supra.* This decision is subject to judicial review. M.G.L. c. 30A § 14.

tained in the Report, prior to suspension, would not impose an onerous burden on the state's administrative procedure.

The Court in *Eldridge* examined the pretermination procedures required by the Social Security Act and the relevant regulations and concluded that they provided sufficient safeguards so as to preclude the necessity of a pretermination evidentiary hearing. However, the pretermination procedures available in *Eldridge* differ from that involved in the present action in at least one significant respect. In *Eldridge*, the recipient was given full access to the information upon which the administrative decision was to be rendered and given the opportunity to submit additional evidence or arguments "to challenge directly the accuracy of information in his file as well as the correctness of the agency's tentative conclusions." *Eldridge, supra*, 424 U.S. at 346, 96 S.Ct. at 908. The risk of an erroneous termination was thus minimized. *Cf. Arnett v. Kennedy, supra.* The Massachusetts statute, however, does not afford the licensee, prior to suspension, any opportunity to respond to the contention of the police that he improperly refused to submit to a chemical test.[12]

The third and final factor to consider is the interest the state seeks to protect. It is undisputed that a significant percentage of traffic fatalities are caused by drivers who operate while under the influence of intoxicating liquor. Nevertheless, as the courts in *Holland, supra*, and *Chavez, supra*, correctly pointed out, the state's summary license suspension statute does not remove the drunk driver from the highway, so long as he submits to a chemical test, but only removes the motorist who has refused to submit to a test.

The present defendant, however, asserts that the commonwealth's interest in summary license suspension is not only in immediately removing drinking drivers from the road, but, in view of a chemical test's subsequent evidentiary value, is also in compelling motorists to submit to a breathalyzer or similar type of test. He contends that the use of the chemical test provided for under the statute "eliminate[s] mistakes which may arise from objective observation alone . . . ." *Popp v. Motor Vehicle Department*, 211 Kan. 763, 508 P.2d 991, 995 (1973). As such it is extremely helpful in convicting those charged with driving while under the influence of intoxicating liquor. The defendant argues that only the threat of immediate license suspension is sufficient to ensure the motorist's cooperation. We do not question the breathalyzer's evidentiary value and that the state consequently has an interest in encouraging motorists to take the test. We are not, however, persuaded by defendant's argument that the delay caused by a mandatory hearing or opportunity to respond prior to suspension would discourage motorists from taking a chemical test when requested to do so. Rather, we believe that the state's interest can still be advanced even though the licensee is given some opportunity to respond prior to suspension. The state could, for example, establish a maximum time period within which the licensee, upon receiving notice of pending suspension, would be able to respond to any or all of the three issues which may now be contested only in a post-suspension hearing. Decision on the suspension could then be rendered within a pre-established time frame. The licensee would thus be afforded procedural safeguards while the threat of suspension would remain sufficiently certain so as to continue to serve as an incentive to take the breathalyzer test. It is not, of course, for this court to make legislative decisions determining the most efficacious manner in which due

---

12. In *Mitchell v. W. T. Grant Co.*, 416 U.S. 600, 94 S.Ct. 1895, 40 L.Ed.2d 406 (1974), the Supreme Court upheld Louisiana's sequestration statute which allowed a mortgage or lien holder to obtain a writ of sequestration against the debtor without prior notice or hearing. In so doing, the Court stressed certain features of the statutory scheme, including the requirement that the creditor post a bond to protect the debtor from damages and judicial supervision of the ex parte procedure, as well as the weak interest of the debtor in the collateral since he did not have full ownership interest in it. The absence of these features makes the present case distinguishable.

process is to be satisfied. Our suggestion, however, does demonstrate the existence of at least one viable alternative to the present statutory scheme which accommodates both the state's interest and the motorist's constitutional right to due process.

Our dissenting brother believes that the potential harm from an erroneous deprivation is alleviated by the provision of an immediate hearing upon the driver surrendering his license to the Registrar. However, as we have already noted, note 11, *supra*, and our dissenting brother apparently concedes, such a hearing is likely to be delayed. Since the suspension continues during this period, we must conclude that additional safeguards are mandated before suspension can be imposed. While we appreciate and share our brother's concern for ensuring the state's ability to compel drivers to take a chemical test, we do not believe this interest is sacrificed by providing the licensee at least a minimal opportunity to be heard prior to suspension.

The present case should also be distinguished from the decision in *Almeida v. Lucey*, 372 F.Supp. 109 (D.Mass.), aff'd 419 U.S. 806, 95 S.Ct. 22, 42 L.Ed.2d 36 (1974). In that case, the court rejected a constitutional challenge to M.G.L. c. 218 § 26 which provided for an automatic one-year suspension of a motorist's license upon his conviction in a jury-waived state district court trial. Thus, in *Almeida*, there was an opportunity for a hearing prior to license suspension. The thrust of the constitutional challenge in *Almeida* was the inadequacy of the hearing provided in the district court since it was subject to a de novo trial in Superior Court. The court expressly declined to rule on the plaintiff's challenge to the constitutionality of the Massachusetts two-tier system of criminal justice. It chose instead to find that at least "[f]or a determination adequate to support revoking a license, a non-jury [state] district court proceeding provides all the necessary elements of due process." 372 F.Supp. at 111. In contrast to *Almeida*, the basis of the constitutional challenge in the present action is the lack of any opportunity to be heard prior to license suspension. The question in the case at bar is not what kind of hearing is required, but whether any pre-suspension opportunity to be heard is required at all. See, Friendly, *Some Kind of Hearing*, 123 U.Pa.L.Rev. 1267 (1975).

### Class Action

■ Plaintiff seeks to bring this suit as a class action under Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure. Plaintiff purports to represent a class consisting of those persons whose Massachusetts license to operate a motor vehicle has been suspended by the defendant or his predecessors or successors in office, prior to an opportunity for a hearing on such suspension. Pursuant to subsection (c)(1) of Rule 23, the court determines and orders that this action is properly maintainable as a class action. The plaintiff may sue as a representative of the class he seeks to represent.

The court finds that the class is so numerous that joinder of all members is impracticable, that there are questions of law or fact common to the class, that the claims of the representative party here are typical of the claims of the class he represents, and that the representative party will fairly and adequately protect the interests of the class. In addition, the court finds that the defendant has acted on grounds generally applicable to the class by automatically suspending the licenses of class member without a hearing pursuant to M.G.L. c. 90 § 24(1)(f). The court therefore finds the class action to be maintainable under Rule 23(b)(2).

For the reasons stated herein the Massachusetts implied consent statute is declared to be unconstitutional and the defendant Registrar and his successors in office are hereby enjoined from enforcing M.G.L. c. 90 § 24(1)(f).

LEVIN H. CAMPBELL, Circuit Judge (dissenting).

I agree that the legal standard to apply in determining whether the Massachusetts procedures comply with due process is

found in *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), a case holding that social security disability benefits may be suspended during the year that it may take to hold and conclude a hearing on the suspension. Referring to earlier due process decisions, the Court said,

> "These decisions underscore the truism that '[d]ue process, unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances.' . . . Accordingly, resolution of the issue whether the administrative procedures provided here are constitutionally sufficient requires analysis of the governmental and private interests that are affected."

*Id.* at 334, 96 S.Ct. at 902–903 [citations omitted]. My disagreement with my brothers stems from my belief that they underestimate the adequacy of the protections presently afforded to a licensee, and are vastly optimistic insofar as they feel that all the Commonwealth is here being asked to do is provide some kind of "minimal" pre-suspension procedure, not a full-dress hearing. In my calculus of the affected governmental and private interests, *see id.*, the Commonwealth deserves to come out on top.

It should be borne in mind that under the challenged state procedures a protesting licensee is entitled to obtain an immediate hearing upon surrender of his license. He need not wait several months. The parties have stipulated, and the court agrees, *see* n.11, that Massachusetts provides the licensee with the right to an *immediate* hearing before the Registrar of Motor Vehicles, with counsel, the very day that he surrenders his license, the hearing being addressed to the only relevant issues, namely whether there was probable cause to arrest, whether there was an arrest, and whether the person arrested refused to submit to a test. A negative finding on any issue leads to reinstatement of the license. Petitioner did not elect to request such a hearing, preferring to seek a hearing under a slower alternate procedure provided by M.G.L. c. 90, § 28.

We are thus talking about a period of suspension that lasts no longer than it takes for the licensee's objections to be fully ventilated. If, as my brothers suggest may sometimes be the case, the errors are merely "clerical", the hearing would be quickly over and the license recovered the same day it was surrendered. If, as seems more likely, the licensee is contesting some aspect of the police officers' version of what occurred, the hearing may take a little longer, since the officers will have to be brought in to testify. In any event, we are talking about no more than several days—as contrasted with the year or more which the Supreme Court found tolerable, in different circumstances, in *Eldridge, see* 424 U.S. at 342, 96 S.Ct. 893.

To be sure, even a brief suspension might be intolerable if based upon inadequate threshold procedures. The probable reliability of such initial procedures is relevant in determining whether the process, overall, is fair. *See id.* at 343, 96 S.Ct. 893. Here the brief pre-hearing suspension rests upon a substantial prima facie showing of violation which, in turn, rests upon facts so simple that the likelihood of police error is small. The relevant facts are whether there was a valid arrest and an improper refusal to take a test. These facts must be reported by the officer in whose presence the test was refused, under penalties of perjury, with an endorsement by a third party who witnessed the refusal as well as by the Chief of Police. That such a report will be reliable in the vast majority of cases seems to me to be a reasonable assumption. The officer assumes personal responsibility for the report; he can be held personally liable, and may be in trouble with his Chief, for any wilful misrepresentation; the facts being reported are few and susceptible of direct observation.

Still, in an imperfect world, one may concede the possibility of occasional mistake,[1] and my brothers argue that in *Eldridge*, it was at least possible to recompense the beneficiary for cancellation of any benefits

---

1. The legislature could also take realistic account of the likelihood of *post facto* pres-

sures and excuses of the cock and bull variety upon both police and registry personnel.

402

later found to have been due. There is, they say, no way to make someone whole for mistaken deprivation of a license. I suppose the latter has to be conceded. However, by the same token, a totally disabled indigent is unlikely to be made whole in any true sense for the suffering undergone during the full year that social security benefits were wrongfully withdrawn. Losing a license for, at most, a few days is surely not to be compared in seriousness with the extended withdrawal of benefits sanctioned in *Eldridge*.

But of course it is not enough merely to point out that the chance of error is small and that the deprivation, in case of error, is less than catastrophic. These facts are important, but under *Eldridge* it must also be asked whether the state's interests justify imposing even this rather minimal burden in the rather unlikely event of a mistake. My brethren think not. They say that "since the plaintiff is not demanding a full evidentiary hearing, the provision of some kind of additional pre-suspension procedure designed to protect against such errors would be minimal. . . ." They suggest that all that is wanting is "the mere provision of an opportunity to respond to the police assertions contained in the Report." If that is all, this case is surely a waste of effort. Even the present law does not prevent the writing of a "mere" response to police assertions. Of course, such a gratuitous response is unlikely to do any good. Presumably what the court really means is that there should not only be an opportunity to respond but a duty upon the Registrar to consider and act upon the response, which means providing administrative machinery either to resolve the controversy on the spot or to defer suspension of the license until after a hearing. I suggest that such procedures, to be meaningful, will impose substantial new administrative burdens, will lessen the effect of the sanction, and will in most instances require an evidentiary hearing. To be sure, a very routine preliminary screening might painlessly catch an occasional "clerical" error, but it is not forthright to pretend that clerical errors are what this case is all about. Such an error, if not resolved informally by a phone call to the police, can be quickly corrected at the hearing which the licensee immediately receives when he surrenders his license. The more likely claim of error will not be "clerical": it will involve, like the present case, a claim which the Registrar can only determine after a hearing attended by both sides. Issues of fact and credibility will most likely be present. What good, then, will "the mere provision of an opportunity to respond" have done? Arguably the Registrar can make a judgment, if the licensee's story sounds compelling, to put off suspension until after a hearing. But if he is granted this kind of discretion[2] I suggest that many persons refusing to take a test will now be encouraged to fight suspension by protest and written argument. The number of protests and probably of hearings will increase since there will be a clear tactical advantage to filing an objection. At the very least, the objection may serve to delay the suspension. The ultimate effect will be to lessen the reality of the threat of immediate suspension and to impose new burdens and costs on the Registrar.

I think that Massachusetts legislators could rationally have determined that only by delaying adjudicative procedures until *after* surrender of the license could they assure an expeditious carrying out of the sanction adopted to force people to submit to the chemical or breath test. The more discretion is given to the Registrar to postpone the evil day when the license is surrendered, the more likely it is that some drivers will be able to discover "angles" to evade the consequences of their refusal to submit to the test and the more pressures will be generated upon officials to back down. The Attorney General advises us that the cases where drivers decline to submit to the test number in the thousands.

2. Of course, if the Registrar were granted no discretion, a pre-suspension proceeding would be pointless.

We are dealing with a matter where a balance must be struck between the requirements of realistic enforcement and the affording of ideal procedures. Judges and lawyers all too readily see the world as an endless extension of courtrooms and hearings. There is also the right of the public to highway regulations that are sufficiently potent to accomplish their goals.

In my view, given the seriousness of the problem which this statute seeks to attack, drunken driving and the desirability of arming the police and the Registrar with workable weapons to require submission to chemical and breath tests, the procedures here challenged are not unreasonable. The maximum harm to the occasional citizen who is mistakenly embroiled—a very brief suspension of his license[3]—is justified by the practical need for summary procedures that can be applied on a statewide basis to thousands of motorists. Even the fairest of procedures cannot avoid the possibility of occasional error. Society could not exist if the Constitution required nothing but error-free laws. Innocent men are occasionally put to the expense and fright of a criminal trial; license renewals get lost in the mail; credit cards get charged to the wrong account. Due process does not require society to stop functioning until the millenium.

This, moreover, is the sort of legislation which is likely to be corrected by the legislature itself if too harsh in practice. Most voters are drivers, and will complain in no uncertain terms if procedures perceived to be oppressive are applied to themselves, their children and their neighbors. Traffic regulations involve a tension between our desire for maximum freedom and our desire for maximum protection from "the other fellow". More people die yearly in traffic fatalities than in most wars. Alcohol is said to be the outstanding killer. I think that the legislature is ordinarily a better forum than the federal court for deciding just how the balance should be struck between toughness and tenderness in this area. The danger of real oppression seems modest.

I would dismiss the petition.

on the basis of a sworn police report. The limited summary power seems to me no different than the summary power to tow an illegally parked vehicle.

---

**3.** If a hearing on the suspension were not available for a protracted period of time, I would feel quite differently. Here the citizen is merely losing his license during the hearing period