# MACKEY, REGISTRAR OF MOTOR VEHICLES OF MASSACHUSETTS *v.* MONTRYM

No. 77–69.   Argued November 29, 1978—Decided June 25, 1979

BURGER, C. J., delivered the opinion of the Court, in which WHITE, BLACKMUN, POWELL, and REHNQUIST, JJ., joined. STEWART, J., filed a dissenting opinion, in which BRENNAN, MARSHALL, and STEVENS, JJ., joined, *post*, p. 19.

*Mitchell J. Sikora, Jr.*, Assistant Attorney General of Massachusetts, argued the cause for appellant. With him on the briefs were *Francis X. Bellotti*, Attorney General, and *S. Stephen Rosenfeld* and *Steven A. Rusconi*, Assistant Attorneys General.

*Robert W. Hagopian* argued the cause and filed a brief for appellee.

MR. CHIEF JUSTICE BURGER delivered the opinion of the Court.

The question presented by this appeal is whether a Massachusetts statute that mandates suspension of a driver's license because of his refusal to take a breath-analysis test upon arrest for driving while under the influence of intoxicating liquor is void on its face as violative of the Due Process Clause of the Fourteenth Amendment.

Commonly known as the implied consent law, the Massachusetts statute provides:

"Whoever operates a motor vehicle upon any [public] way . . . shall be deemed to have consented to submit to a chemical test or analysis of his breath in the event that he is arrested for operating a motor vehicle while under the influence of intoxicating liquor. . . . If the person arrested refuses to submit to such test or analysis, after

having been informed that his license . . . to operate motor vehicles . . . in the commonwealth shall be suspended for a period of ninety days for such refusal, no such test or analysis shall be made, but the police officer before whom such refusal was made shall immediately prepare a written report of such refusal[, which] . . . shall be endorsed by a third person who shall have witnessed such refusal[,] . . . shall be sworn to under the penalties of perjury by the police officer before whom such refusal was made[,] . . . shall set forth the grounds for the officer's belief that the person arrested had been driving a motor vehicle . . . while under the influence of intoxicating liquor, and shall state that such person had refused to submit to such chemical test or analysis when requested by such police officer to do so. Each such report shall be endorsed by the police chief . . . and shall be sent forthwith to the registrar. Upon receipt of such report, the registrar shall suspend any license or permit to operate motor vehicles issued to such person . . . for a period of ninety days." Mass. Gen. Laws Ann., ch. 90, § 24 (1)(f) (West Supp. 1979).

I

While driving a vehicle in Acton, Mass., appellee Donald Montrym was involved in a collision about 8:15 p. m. on May 15, 1976. Upon arrival at the scene of the accident an Acton police officer observed, as he wrote in his official report, that Montrym was "glassy eyed," unsteady on his feet, slurring his speech, and emitting a strong alcoholic odor from his person. The officer arrested Montrym at 8:30 p. m. for operating his vehicle while under the influence of intoxicating liquor, driving to endanger, and failing to produce his motor vehicle registration upon request. Montrym was then taken to the Acton police station.

There, Montrym was asked to take a breath-analysis examination at 8:45 p. m. He refused to do so.[1] Twenty minutes after refusing to take the test and shortly after consulting his lawyer, Montrym apparently sought to retract his prior refusal by asking the police to administer a breath-analysis test. The police declined to comply with Montrym's belated request. The statute leaves an officer no discretion once a breath-analysis test has been refused: "If the person arrested refuses to submit to such test or analysis, . . . the police officer before whom such refusal was made *shall immediately* prepare a written report of such refusal." § 24 (1) (f) (emphasis added). The arresting officer completed a report of the events, including the refusal to take the test.

As mandated by the statute, the officer's report recited (a) the fact of Montrym's arrest for driving while under the influence of intoxicating liquor, (b) the grounds supporting that arrest, and (c) the fact of his refusal to take the breath-analysis examination. As required by the statute, the officer's report was sworn to under penalties of perjury, and endorsed by the arresting officer and another officer present when Montrym refused to take the test; it was counterendorsed by the chief of police. The report was then sent to the Massachusetts Registrar of Motor Vehicles pursuant to the statute.

On June 2, 1976, a state court dismissed the complaint brought against Montrym for driving while under the influence of intoxicating liquor.[2] Dismissal apparently was predicated on the refusal of the police to administer a breath-analysis test at Montrym's request after he sought to retract his initial

---

[1] Montrym does not deny having refused the test; he claims that he was not advised of the mandatory 90-day suspension penalty prior to his refusal, as required by the statute; however, the officer's report of refusal asserts that Montrym was given the required prior warning.

[2] Montrym was also acquitted on the driving-to-endanger charge but was found guilty on the registration charge and fined $15.

refusal to take the test. The dismissal order of the state court cryptically recites:

> "Dismissed. Breathalyzer refused when requested within ½ hr of arrest at station. See affidavit & memorandum."

According to Montrym's affidavit incorporated by reference in the state court's dismissal order, he was visited by an attorney at 9:05 o'clock on the night of his arrest; and, after consulting with counsel, he requested a breath-analysis test. The police, however, refused the requests made by Montrym and his counsel between 9:07 and 10:07 p. m.

Montrym's attorney immediately advised the Registrar by letter of the dismissal of this charge and asked that the Registrar stay any suspension of Montrym's driver's license. Enclosed with the letter was a copy of Montrym's affidavit attesting to the officer's refusal to administer a breath-analysis test at his request. However, Montrym's attorney did not enclose a certified copy of the state court's order dismissing the charge.

The Registrar, who has no discretionary authority to stay a suspension mandated by the statute,[3] formally suspended Montrym's license for 90 days on June 7, 1976. The suspension notice stated that it was effective upon its issuance and directed Montrym to return his license at once. It advised Montrym of his right to appeal the suspension.[4]

---

[3] It provides in relevant part:

"Upon receipt of such report [of refusal], the registrar *shall* suspend any license . . . issued to such person . . . for a period of ninety days." Mass. Gen. Laws Ann., ch. 90, § 24 (1) (f) (West Supp. 1979) (emphasis added).

[4] Massachusetts Gen. Laws Ann., ch. 90, § 28 (West 1969), provides that any person aggrieved by a ruling of the Registrar may appeal such ruling to the Board of Appeal, which may, after a hearing, order such ruling to be affirmed, modified, or annulled. However, no such appeal shall operate to stay any ruling of the Registrar. In turn, the Board's decision is subject to judicial review. Mass. Gen. Laws Ann., ch. 30A, § 14 (West 1979).

When Montrym received the suspension notice, his attorney requested an appeal on the question of whether Montrym had in fact refused a breath-analysis test within the meaning of the statute. Montrym surrendered his license by mail on June 8, 1976.

Under the Massachusetts statute, Montrym could have obtained an *immediate* hearing before the Registrar at any time after he had surrendered his license; that hearing would have resolved all questions as to whether grounds existed for the suspension.[5] For reasons not explained, but presumably

---

[5] Massachusetts Gen. Laws Ann., ch. 90, § 24 (1) (g) (West 1969), provides:

"Any person whose license, permit or right to operate has been suspended under paragraph (*f*) shall be entitled to a hearing before the registrar which shall be limited to the following issues: (1) did the police officer have reasonable grounds to believe that such person had been operating a motor vehicle while under the influence of intoxicating liquor upon any [public] way . . . , (2) was such person placed under arrest, and (3) did such person refuse to submit to such test or analysis. If, after such hearing, the registrar finds on any one of the said issues in the negative, the registrar shall reinstate such license, permit or right to operate."

As stipulated by the parties, the § 24 (1) (g) hearing is available the moment the driver surrenders his license. At the hearing, the suspended driver may be represented by counsel. Upon request, a hearing officer will examine the report of refusal and return the driver's license immediately if the report does not comply with the requirements of § 24 (1) (f). If the report complies with those requirements, the burden is on the driver to show either that he was not arrested, that there was no probable cause for arrest, or that he did not refuse to take the breath-analysis test. The hearing may be adjourned at the request of the driver or *sua sponte* by the hearing officer in order to permit the attendance of witnesses or for the gathering of relevant evidence. Witnesses at the hearing are subject to cross-examination by the driver or his attorney, and he may appeal an adverse decision of the Registrar to the Board of Appeal pursuant to § 28.

The Registrar has represented to the Court that a driver can obtain a decision from the hearing officer within one or two days following the driver's receipt of the suspension notice. Montrym asserts that greater delay will occur if the driver raises factual issues requiring the taking of

on advice of counsel, Montrym failed to exercise his right to a hearing before the Registrar; instead, he took an appeal to the Board of Appeal. On June 24, 1976, the Board of Appeal advised Montrym by letter that a hearing of his appeal would be held on July 6, 1976.

Four days later, Montrym's counsel made demand upon the Registrar by letter for the return of his driver's license. The letter reiterated Montrym's acquittal of the driving-under-the-influence charge, asserted that the state court's finding that the officer had refused to administer a breath-analysis test was binding on the Registrar, and declared that suspension of Montrym's license without first holding a hearing violated his right to due process. The letter did not contain a copy of the state court's dismissal order, but did threaten the Registrar with suit if the license were not returned immediately. Had Montrym's counsel enclosed a copy of the order dismissing the drunken-driving charge, the entire matter might well have been disposed of at that stage without more.

Thereafter, forgoing his administrative appeal scheduled for hearing on July 6, Montrym brought this action asking the convening of a three-judge United States District Court. The complaint alleges that § 24 (1)(f) is unconstitutional on its face and as applied in that it authorized the suspension of Montrym's driver's license without affording him an opportunity for a presuspension hearing. Montrym sought a temporary restraining order enjoining the suspension of his license, compensatory and punitive damages, and declaratory and injunctive relief on behalf of all persons whose licenses had been suspended pursuant to the statute without a prior hearing.

On July 9, 1976, a single District Judge issued the temporary restraining order sought by Montrym and directed

---

evidence. But, even under his more pessimistic view, which takes into account the possibility of intervening weekends, the driver will obtain a decision from the hearing officer within 7 to 10 days.

the Registrar to return Montrym's license pending further order of the court. Subsequently, a three-judge District Court was convened pursuant to 28 U. S. C. §§ 2281 (1970 ed.), 2284, and Montrym moved for partial summary judgment on stipulated facts.

With one judge dissenting, the three-judge District Court granted Montrym's motion. Relying principally on this Court's decision in *Bell* v. *Burson,* 402 U. S. 535 (1971), the District Court concluded that Montrym was entitled as a matter of due process to some sort of a presuspension hearing before the Registrar to contest the allegation of his refusal to take the test. In a partial summary judgment order issued on April 4, and a final judgment order issued on April 12, the District Court certified the suit under Fed. Rule Civ. Proc. 23 (b)(2) as a class action on behalf of all persons whose licenses to operate a motor vehicle had been suspended pursuant to Mass. Gen. Laws Ann., ch. 90, § 24 (1)(f) (West Supp. 1979). The court then declared the statute unconstitutional on its face as violative of the Due Process Clause, permanently enjoined the Registrar from further enforcing the statute, and directed him to return the driver's licenses of the plaintiff class members. *Montrym* v. *Panora,* 429 F. Supp. 393 (Mass. 1977).

After taking timely appeals from the District Court's judgment orders, the Registrar moved the District Court for a stay and modification of its judgment, which motions were denied. After release of our opinion in *Dixon* v. *Love,* 431 U. S. 105 (1977), upholding the constitutionality of an Illinois statute authorizing the summary suspension of a driver's license prior to any evidentiary hearing, the Registrar moved for reconsideration of his motions for a stay and modification of judgment.

In a second opinion issued October 6, 1977, the District Court reasoned that *Love* was distinguishable on several grounds and denied the Registrar's motion to reconsider; the

dissenting judge thought *Love* controlled. *Montrym* v. *Panora*, 438 F. Supp. 1157 (Mass. 1977).

We noted probable jurisdiction following the submission of supplemental briefs by the parties. *Sub nom. Panora* v. *Montrym,* 435 U. S. 967 (1978). We reverse.[6]

## II

The Registrar concedes here that suspension of a driver's license for statutorily defined cause implicates a protectible property interest;[7] accordingly, the only question presented by this appeal is what process is due to protect against an erroneous deprivation of that interest. Resolution of this inquiry requires consideration of a number of factors:

> "First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews* v. *Eldridge*, 424 U. S. 319, 335 (1976).

---

[6] Because the District Court held the statute unconstitutional on its face and granted classwide relief, it never reached the "as applied" challenge raised in Montrym's complaint; nor do we. The validity of that challenge, and the resolution of any contested factual issues relevant to it, must be determined by the District Court on remand in light of our opinion.

Also, the question of whether the Commonwealth is constitutionally required to give notice of the § 24 (1) (g) hearing procedure independent of the notice given by the statute itself was neither framed by the pleadings nor decided by the District Court; it is not properly before us notwithstanding the observations of the dissenting opinion on this issue. See *post,* at 27–28, and n. 4.

[7] That the Due Process Clause applies to a state's suspension or revocation of a driver's license is clear from our decisions in *Dixon* v. *Love,* 431 U. S. 105, 112 (1977), and *Bell* v. *Burson,* 402 U. S. 535, 539 (1971).

Applying this balancing test, the District Court concluded due process required an opportunity for hearing before suspension of a license. 429 F. Supp., at 398–400. Later, the court further held that our decision in *Dixon* v. *Love, supra,* did not control. *Love* was thought distinguishable because the potential for irreparable personal and economic hardship was regarded as greater under the Massachusetts statutory scheme than the Illinois scheme; the risk of error was deemed more substantial as well; and requiring a hearing before suspending a driver's license for refusing to take a breath-analysis test was believed not to offend the state interest in safe highways. 438 F. Supp., at 1159–1161.

We conclude that *Love* cannot be materially distinguished from the case before us. Both cases involve the constitutionality of a statutory scheme for administrative suspension of a driver's license for statutorily defined cause without a presuspension hearing. In each, the sole question presented is the appropriate timing of the legal process due a licensee. And, in both cases, that question must be determined by reference to the factors set forth in *Eldridge.*

## A

The first step in the balancing process mandated by *Eldridge* is identification of the nature and weight of the private interest affected by the official action challenged. Here, as in *Love,* the private interest affected is the granted license to operate a motor vehicle. More particularly, the driver's interest is in continued possession and use of his license pending the outcome of the hearing due him. As we recognized in *Love,* that interest is a substantial one, for the Commonwealth will not be able to make a driver whole for any personal inconvenience and economic hardship suffered by reason of any delay in redressing an erroneous suspension through postsuspension review procedures. 431 U. S., at 113.

But, however substantial Montrym's property interest may

be, it is surely no more substantial than the interest involved in *Love*. The private interest involved here actually is *less* substantial, for the Massachusetts statute authorizes suspension for a maximum of only 90 days, while the Illinois scheme permitted suspension for as long as a year and even allowed for the possibility of indefinite revocation of a license.

To be sure, as the District Court observed, the Illinois statute in *Love* contained provisions for hardship relief unavailable under the Massachusetts statute. Though we adverted to the existence of such provisions in *Love*, they were in no sense the "controlling" factor in our decision that the District Court believed them to be. 438 F. Supp., at 1159. Hardship relief was available under the Illinois scheme only *after* a driver had been suspended and had demonstrated his eligibility for such relief. See *Dixon* v. *Love*, 431 U. S., at 114 n. 10. The bearing such provisions had in *Love* stemmed from the delay involved in providing a postsuspension hearing. Here, unlike the situation in *Love*, a postsuspension hearing is available *immediately* upon a driver's suspension and may be initiated by him simply by walking into one of the Registrar's local offices and requesting a hearing. The *Love* statute, in contrast, did not mandate that a date be set for a postsuspension hearing until 20 days after a written request for such a hearing was received from the affected driver. *Id.*, at 109–110.

The duration of any potentially wrongful deprivation of a property interest is an important factor in assessing the impact of official action on the private interest involved. *Fusari* v. *Steinberg*, 419 U. S. 379, 389 (1975). The District Court's failure to consider the relative length of the suspension periods involved in *Love* and the case at bar, as well as the relative timeliness of the postsuspension review available to a suspended driver, was erroneous. Neither the nature nor the weight of the private interest involved in this case compels a result contrary to that reached in *Love*.

## B

Because a primary function of legal process is to minimize the risk of erroneous decisions, *Greenholtz* v. *Nebraska Penal Inmates,* 442 U. S. 1, 12–13 (1979); *Addington* v. *Texas,* 441 U. S. 418, 423 (1979), the second stage of the *Eldridge* inquiry requires consideration of the likelihood of an erroneous deprivation of the private interest involved as a consequence of the procedures used. And, although this aspect of the *Eldridge* test further requires an assessment of the relative reliability of the procedures used and the substitute procedures sought, the Due Process Clause has never been construed to require that the procedures used to guard against an erroneous deprivation of a protectible "property" or "liberty" interest be so comprehensive as to preclude any possibility of error. The Due Process Clause simply does not mandate that all governmental decisionmaking comply with standards that assure perfect, error-free determinations. *Greenholtz* v. *Nebraska Penal Inmates, supra,* at 7. Thus, even though our legal tradition regards the adversary process as the best means of ascertaining truth and minimizing the risk of error, the "ordinary principle" established by our prior decisions is that "something less than an evidentiary hearing is sufficient prior to adverse administrative action." *Dixon* v. *Love, supra,* at 113. And, when prompt postdeprivation review is available for correction of administrative error, we have generally required no more than that the predeprivation procedures used be designed to provide a reasonably reliable basis for concluding that the facts justifying the official action are as a responsible governmental official warrants them to be. See, *e. g., Barry* v. *Barchi, post,* at 64–65; *Mathews* v. *Eldridge,* 424 U. S., at 334.

As was the case in *Love,* the predicates for a driver's suspension under the Massachusetts scheme are objective facts either within the personal knowledge of an impartial government official or readily ascertainable by him. Cause arises for license suspension if the driver has been arrested for

driving while under the influence of an intoxicant, probable cause exists for arrest, and the driver refuses to take a breath-analysis test. The facts of the arrest and the driver's refusal will inevitably be within the personal knowledge of the reporting officer; indeed, Massachusetts requires that the driver's refusal be witnessed by two officers. At the very least, the arresting officer ordinarily will have provided the driver with an informal opportunity to tell his side of the story and, as here, will have had the opportunity to observe the driver's condition and behavior before effecting any arrest.

The District Court, in holding that the Due Process Clause mandates that an opportunity for a further hearing before the Registrar *precede* a driver's suspension, overstated the risk of error inherent in the statute's initial reliance on the corroborated affidavit of a law enforcement officer. The officer whose report of refusal triggers a driver's suspension is a trained observer and investigator. He is, by reason of his training and experience, well suited for the role the statute accords him in the presuspension process. And, as he is personally subject to civil liability for an unlawful arrest and to criminal penalties for willful misrepresentation of the facts, he has every incentive to ascertain accurately and truthfully report the facts. The specific dictates of due process must be shaped by "the risk of error inherent in the truthfinding process as applied to the generality of cases" rather than the "rare exceptions." *Mathews* v. *Eldridge, supra,* at 344. And, the risk of erroneous observation or deliberate misrepresentation of the facts by the reporting officer in the ordinary case seems insubstantial.

Moreover, as this case illustrates, there will rarely be any genuine dispute as to the historical facts providing cause for a suspension. It is significant that Montrym does *not* dispute that he was arrested, or that probable cause existed for his arrest, or that he initially refused to take the breath-analysis test at the arresting officer's request. The allegedly "factual"

dispute that he claims a constitutional right to raise and have determined by the Registrar prior to his suspension really presents questions of law; namely, whether the state court's subsequent finding that the police *later* refused to administer a breath-analysis test at Montrym's request is binding on the Registrar as a matter of collateral estoppel; and, if so, whether that finding undermines the validity of Montrym's suspension, which may well be justified under the statute solely on the basis of Montrym's initial refusal to take the breath-analysis test and notwithstanding the officer's subsequent refusal to honor Montrym's belated request for the test.[8] The Commonwealth must have the authority, if it is to protect people from drunken drivers, to require that the breath-analysis test record the alcoholic content of the bloodstream at the earliest possible moment.

Finally, even when disputes as to the historical facts do arise, we are not persuaded that the risk of error inherent in the statute's initial reliance on the representations of the reporting officer is so substantial in itself as to require that the Commonwealth stay its hand pending the outcome of any evidentiary hearing necessary to resolve questions of credibility or conflicts in the evidence. Cf. *Barry* v. *Barchi, post,* at 64–65. All that Montrym seeks was available to him immediately upon his suspension, and we believe that the "same day" hearing before the Registrar available under § 24 (1) (g) provides an appropriately timely opportunity for the licensee to tell his side of the story to the Registrar, to obtain correction of clerical errors, and to seek prompt resolution of any factual disputes he raises as to the accuracy of the officer's report of refusal.

---

[8] An evidentiary hearing into the historical facts would be ill suited for resolution of such questions of law. Indeed, it is not clear whether the Registrar even has the plenary authority to resolve such questions. Ultimately, any legal questions must be resolved finally by the Massachusetts courts on judicial review of the decision of the Board of Appeal after any appeal taken from the ruling of the Registrar. See n. 4, *supra.*

16

Nor would the avowedly "nonevidentiary" presuspension hearing contemplated by the District Court substantially enhance the reliability of the presuspension process. Clerical errors and deficiencies in the officer's report of refusal, of course, could be called to the Registrar's attention if the driver were provided with an opportunity to respond to the report in writing prior to suspension. But if such errors and deficiencies are genuinely material they already will have been noted by the Registrar in the ordinary course of his review of the report. Just as the Registrar has no power to stay a suspension upon receipt of a report of refusal that complies on its face with statutory requirements, he has no power to suspend a license if the report is materially defective. Necessarily, then, the Registrar must submit the officer's report to his independent scrutiny. This independent review of the report of refusal by a detached public officer should suffice in the ordinary case to minimize the only type of error that could be corrected by something less than an evidentiary hearing.

The only other purpose that might be served by an opportunity to respond to the report of refusal prior to a driver's suspension would be alerting the Registrar to the existence of factual disputes between the driver and the reporting officer. This would be an exercise in futility, for the Registrar has no discretion to stay a suspension pending the outcome of an evidentiary hearing. And, it simply begs the question of a driver's right to a presuspension *evidentiary* hearing to suggest, as did the District Court, that the Registrar be given such discretion. The Massachusetts Legislature has already made the discretionary determination that the District Court apparently would have the Registrar make on a case-by-case basis. It has determined that the Registrar, who is further removed in time and place from the operative facts than the reporting officer, should treat a report of refusal that complies on its face with the statutory requirements as presumptively accurate notwithstanding any factual disputes raised by a driver. Simply put, it has determined that the

Registrar is not in a position to make an informed probable-cause determination or exercise of discretion *prior* to an evidentiary hearing. We cannot say the legislature's judgment in this matter is irrational.

In summary, we conclude here, as in *Love,* that the risk of error inherent in the presuspension procedures chosen by the legislature is not so substantial in itself as to require us to depart from the "ordinary principle" that "something less than an evidentiary hearing is sufficient prior to adverse administrative action." 431 U. S., at 113. We fail to see how reliability would be materially enhanced by mandating the presuspension "hearing" deemed necessary by the District Court.

C

The third leg of the *Eldridge* balancing test requires us to identify the governmental function involved; also, to weigh in the balance the state interests served by the summary procedures used, as well as the administrative and fiscal burdens, if any, that would result from the substitute procedures sought.

Here, as in *Love,* the statute involved was enacted in aid of the Commonwealth's police function for the purpose of protecting the safety of its people. As we observed in *Love,* the paramount interest the Commonwealth has in preserving the safety of its public highways, standing alone, fully distinguishes this case from *Bell* v. *Burson,* 402 U. S., at 539, on which Montrym and the District Court place principal reliance. See 431 U. S., at 114–115. We have traditionally accorded the states great leeway in adopting summary procedures to protect public health and safety. States surely have at least as much interest in removing drunken drivers from their highways as in summarily seizing mislabeled drugs or destroying spoiled foodstuffs.[9] *E. g., Ewing* v.

---

[9] Drunken drivers accounted for 283 of the 884 traffic fatalities in Massachusetts during 1975 alone and must have been responsible for countless

*Mytinger & Casselberry, Inc.,* 339 U. S. 594 (1950); *North American Storage Co.* v. *Chicago,* 211 U. S. 306 (1908).

The Commonwealth's interest in public safety is substantially served in several ways by the summary suspension of those who refuse to take a breath-analysis test upon arrest. First, the very existence of the summary sanction of the statute serves as a deterrent to drunken driving. Second, it provides strong inducement to take the breath-analysis test and thus effectuates the Commonwealth's interest in obtaining reliable and relevant evidence for use in subsequent criminal proceedings. Third, in promptly removing such drivers from the road, the summary sanction of the statute contributes to the safety of public highways.

The summary and automatic character of the suspension sanction available under the statute is critical to attainment of these objectives. A presuspension hearing would substantially undermine the state interest in public safety by giving drivers significant incentive to refuse the breath-analysis test and demand a presuspension hearing as a dilatory tactic. Moreover, the incentive to delay arising from the availability of a presuspension hearing would generate a sharp increase in the number of hearings sought and therefore impose a substantial fiscal and administrative burden on the Commonwealth. *Dixon* v. *Love,* 431 U. S., at 114.

Nor is it any answer to the Commonwealth's interest in public safety that its interest could be served as well in other ways. The fact that the Commonwealth, for policy reasons of its own, elects not to summarily suspend those drivers who

---

other injuries to persons and property. App. 31. More people were killed in alcohol-related traffic accidents in a year in this one State than were killed in the tragic DC-10 crash at O'Hare Airport in May 1979. Traffic deaths commonly exceed 50,000 annually in the United States, and approximately one-half of these fatalities are alcohol related. See U. S. Dept. of Transportation, 1977 Highway Safety Act Report App. A-9 (Table A-1); U. S. Dept. of Health, Education, and Welfare, Third Special Report on Alcohol and Health 61 (1978).

do take the breath-analysis test does not, as the District Court erroneously suggested, in any way undermine the Commonwealth's strong interest in summarily removing from the road those who refuse to take the test. A state plainly has the right to offer incentives for taking a test that provides the most reliable form of evidence of intoxication for use in subsequent proceedings. Indeed, in many cases, the test results could lead to prompt release of the driver with no charge being made on the "drunken driving" issue. And, in exercising its police powers, the Commonwealth is not required by the Due Process Clause to adopt an "all or nothing" approach to the acute safety hazards posed by drunken drivers.

We conclude, as we did in *Love*, that the compelling interest in highway safety justifies the Commonwealth in making a summary suspension effective pending the outcome of the prompt postsuspension hearing available.

Accordingly, the judgment of the District Court is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

MR. JUSTICE STEWART, with whom MR. JUSTICE BRENNAN, MR. JUSTICE MARSHALL, and MR. JUSTICE STEVENS join, dissenting.

The question in this case, simply put, is whether a person who is subject to losing his driver's license for three months as a penalty for allegedly refusing a demand to take a breath-analysis test is constitutionally entitled to some sort of hearing before his license is taken away. In Massachusetts, such suspensions are effected by the Registrar of Motor Vehicles solely upon the strength of a policeman's affidavit recounting *his* version of an encounter between the police and the motorist. Mass. Gen. Laws Ann., ch. 90, § 24 (1) (f) (West Supp. 1979). The driver is afforded no opportunity, before this deprivation occurs, to present his side of the story in a forum

other than a police station. He is given no notice of any entitlement he might have to a "same day" hearing before the Registrar. The suspension penalty itself is concededly imposed not as an emergency measure to remove unsafe drivers from the roads, but as a sanction to induce drivers to submit to breath-analysis tests. In short, the critical fact that triggers the suspension is noncooperation with the police, not drunken driving. In my view, the most elemental principles of due process forbid a State from extracting this penalty without first affording the driver an opportunity to be heard.

## A

Our decisions in *Bell* v. *Burson,* 402 U. S. 535, and *Dixon* v. *Love,* 431 U. S. 105, made clear that a person's interest in his driver's license is "property" that a State may not take away without satisfying the requirements of the due process guarantee of the Fourteenth Amendment. And the constitutional guarantee of procedural due process has always been understood to embody a presumptive requirement of notice and a meaningful opportunity to be heard *before* the State acts finally to deprive a person of his property. *Mullane* v. *Central Hanover Trust Co.,* 339 U. S. 306, 313; *Fuentes* v. *Shevin,* 407 U. S. 67, 82; *Boddie* v. *Connecticut,* 401 U. S. 371, 378; *Bell* v. *Burson, supra,* at 542; *Memphis Light, Gas & Water Div.* v. *Craft,* 436 U. S. 1, 16, 19.

This settled principle serves to ensure that the person threatened with loss has an opportunity to present his side of the story to a neutral decisionmaker "at a time when the deprivation can still be prevented." *Fuentes* v. *Shevin, supra,* at 81–82. It protects not simply against the risk of an erroneous decision. It also protects a "vulnerable citizenry from the overbearing concern for efficiency . . . that may characterize praiseworthy government officials no less . . . than mediocre ones." *Stanley* v. *Illinois,* 405 U. S. 645, 656. Cf. *Memphis Light, Gas & Water Div.* v. *Craft, supra,* at 21 n. 28. The very act of dealing with what purports to be

an "individual case" without first affording the person involved the protection of a hearing offends the concept of basic fairness that underlies the constitutional due process guarantee.

When a deprivation is irreversible—as is the case with a license suspension that can at best be shortened but cannot be undone—the requirement of some kind of hearing before a final deprivation takes effect is all the more important. Thus, in *Bell* v. *Burson,* the Court deemed it fundamental that "except in emergency situations" the State must afford a prior hearing before a driver's license termination becomes effective. 402 U. S., at 542.[1] In *Bell,* the State did provide a presuspension administrative hearing, but the Court held that the State could not, while purporting to condition a suspension in part on fault, exclude the element of fault from consideration in that hearing. The dimensions of a prior hearing may, of course, vary depending upon the nature of the case, the interests affected, and the prompt availability of adequate postdeprivation procedures. *Boddie* v. *Connecticut, supra; Mathews* v. *Eldridge,* 424 U. S. 319, 334–335. But when adjudicative facts are involved, when no valid governmental interest would demonstrably be disserved by delay, and when full retroactive relief cannot be provided, an after-the-fact

---

[1] Emergency situations have generally been defined as those in which swift action is necessary to protect public health, safety, revenue or the integrity of public institutions. See, *e. g., Central Union Trust Co.* v. *Garvan,* 254 U. S. 554 (emergency action during wartime); *Ewing* v. *Mytinger & Casselberry, Inc.,* 339 U. S. 594 (seizure of misbranded drugs); *North American Storage Co.* v. *Chicago,* 211 U. S. 306 (seizure of allegedly diseased poultry); *Phillips* v. *Commissioner,* 283 U. S. 589 (effective tax collection); *Fahey* v. *Mallonee,* 332 U. S. 245 (emergency bank management); cf. *Goss* v. *Lopez,* 419 U. S. 565, 582 (to protect a public institution from a continuing danger). See generally J. Freedman, Crisis and Legitimacy: The Administrative Process and American Government (1978); L. Tribe, American Constitutional Law § 10–14 (1978).

evidentiary hearing on a critical issue is not constitutionally sufficient. Compare *Mathews* v. *Eldridge, supra,* with *Bell* v. *Burson, supra.*

The case of *Dixon* v. *Love,* 431 U. S. 105, is not, as the Court seems to suggest, to the contrary. At issue in *Love* was a statute permitting the summary revocation of the license of a repeat traffic offender on the strength of a cumulative record of traffic convictions and suspensions. The Court in *Love* stressed that the appellee had not contested the factual basis for his license revocation and had not contested the procedures followed in securing his previous convictions. Instead, the *Love* appellee had merely asserted a right to appear in person in advance to ask for leniency. *Id.,* at 114. Under these circumstances, the Court held that summary suspension was permissible, for the "appellee had the opportunity for a *full judicial hearing* in connection with each of the traffic convictions on which the . . . decision was based." *Id.,* at 113 (emphasis added). *Love,* then, involved an instance in which a revocation followed virtually automatically from the fact of duly obtained convictions for a stated number of traffic offenses. It established no broad exception to the normal presumption in favor of a prior hearing. See *Memphis Light, Gas & Water Div.* v. *Craft, supra,* at 19 n. 24.

## B

The Court likens this driver's license suspension to the revocation at issue in *Love,* but in my view that analogy simply cannot be drawn. The Massachusetts breath-analysis suspension statute, in clear contrast to the *Love* statute, affords the driver no prior hearing of any kind to contest the critical factual allegations upon which the suspension is based. Those allegations can hardly be equated with routinely kept records of serious traffic offense *convictions.*

A breath-analysis suspension is premised upon three factors:

reasonable grounds for an arrest for driving while intoxicated; a proper request by the officer that the driver submit to a breath-analysis test; and a refusal to do so by the driver. Mass. Gen. Laws Ann., ch. 90, § 24 (1)(f) (West Supp. 1979). The appellee in this case was indeed arrested, after a collision in which his car was struck in the rear by a motorcycle, for driving while intoxicated. Moreover, he admitted that he initially refused to take a breath-analysis test. But he consistently contended that he was not informed of the sanction, as is required by § 24 (1)(f), and he vigorously disputed the accuracy of the police affidavit that said he was so informed. His further claim—that he requested a test as soon as he learned by inadvertence of the sanction, and that the police then refused to administer the test—was apparently accepted by the Massachusetts judge who subsequently dismissed the drunken-driving charge against him. Thus, there was clearly a significant factual dispute in this case.

That dispute, as in *Bell* v. *Burson,* concerned a critical element of the statutory basis for a suspension—in this instance whether there was indeed a refusal to take a breath-analysis test after a proper demand. The Court suggests nonetheless that the "fact" of an informed refusal, as well as the other statutory factual bases for a suspension, is somehow so routine, objective, and reliable as to be equivalent to routinely maintained official records of criminal convictions. I find this equation highly dubious. Initial deprivations of liberty based upon *ex parte* probable-cause determinations by the police are, of course, not unusual, *Gerstein* v. *Pugh,* 420 U. S. 103; *ex parte* probable-cause determinations by neutral magistrates relying upon properly corroborated police affidavits to determine whether arrest or search warrants should issue are likewise commonly made. *E. g., Aguilar* v. *Texas,* 378 U. S. 108. But these practices, to the extent that they permit *ex parte* deprivations of liberty or property, are clearly necessitated by the exigencies of law enforcement. They supply no support

24

for the proposition that a police affidavit can provide a constitutionally sufficient basis for the deprivation of property in a civil proceeding, when there is ample time to give the owner an opportunity to be heard in an impartial forum before an impartial decisionmaker.

Moreover, there is a vast difference between the record of duly adjudicated convictions at issue in *Love* and the historical facts of the encounter between the police and a motorist that form the basis for the driver's license suspension in the present case. To be sure, these relatively uncomplicated facts are unquestionably within "the personal knowledge of the reporting officer." *Ante,* at 14. But they are also within the knowledge of the driver. This Court has yet to hold that the police version of a disputed encounter between the police and a private citizen is inevitably accurate and reliable.[2]

I am not persuaded that the relative infrequency with which a driver may be able successfully to show that he did not refuse to take a breath-analysis test should excuse the State from the constitutional need to afford a prior hearing to any person who wishes to make such a challenge. The question whether or not there was such a refusal is one classically subject to adjudicative factfinding, and one that plainly involves issues of credibility and veracity. *Mathews* v. *Eldridge,* 424 U. S., at 343–344. The driver's "opportunity to tell his side of the story" to "the arresting officer," *ante,* at 14, surely

---

[2] Contrary to the Court's suggestion, the case of *Mathews* v. *Eldridge,* 424 U. S. 319, provides no precedential support for the *ex parte* suspension procedure followed by Massachusetts. The disability-benefit termination procedures upheld in *Mathews* did not involve an *"ex parte"* deprivation of property. To the contrary, the Court in *Mathews* stressed that the recipient had been afforded an opportunity to make extensive written submissions to the decisionmaker before any initial termination decision was made. *Id.,* at 344, 345. Given the amenability of the critical issue to written presentation and the clear availability of a prompt post-termination evidentiary hearing, this prior opportunity to be heard—albeit in writing—was deemed constitutionally sufficient.

cannot seriously be deemed a "meaningful opportunity to be heard" in the due process sense. There is simply no escaping the fact that the *first* hearing Massachusetts supplies on a breath-analysis suspension comes *after* the license of the driver has been taken away. And it is clear that the suspension itself effects a final deprivation of property that no subsequent proceeding can restore. Cf. *Mathews* v. *Eldridge, supra,* at 340.[3]

The State has urged, and the Court seems to agree, *ante,* at 17–19, that summary procedures are nevertheless required to further the State's interest in protecting the public from unsafe drivers. It cannot be doubted that the interest in "removing drunken drivers from the road" is significant. But the precedents supporting *ex parte* action have not turned simply on the significance of the governmental interest asserted. To the contrary, they have relied upon the extent to which that interest will be frustrated by the delay necessitated by a prior hearing. *E. g., North American Storage Co.* v. *Chicago,* 211 U. S. 306 (allegedly spoiled food), and cases

---

[3] The Court stresses that a presuspension evidentiary hearing would be futile since the Registrar has no discretion to stay a suspension pending that hearing. The Court also emphasizes that the decision not to give the Registrar such discretion reflects a "rational" legislative choice. *Ante,* at 16–17. I fail to see how these observations answer the procedural due process claim in this case. The choice that the Massachusetts Legislature has made is merely a part of its decision to dispense with a presuspension hearing that is here under constitutional challenge. To be sure, that choice might well be "rational" in the equal protection sense. But the "rationality" of a legislative decision to dispense with the procedural safeguards that constitutionally must precede state deprivation of a person's interest has never been deemed controlling. The Court may, of course, be suggesting that the legislature has established a presumption that a driver who refuses a breath-analysis test is *per se* an unsafe driver. But the State has not made this argument, and indeed it would be a strange one in the context of this statute. For the state law expressly provides that an alleged refusal to take a breath-analysis test is not admissible as evidence in a prosecution for driving while intoxicated. Mass. Gen. Laws Ann., ch. 90, § 24 (1) (e) (West Supp. 1979).

cited in n. 1, *supra.* The breath-analysis test is plainly not designed to remove an irresponsible driver from the road as swiftly as possible. For if a motorist *submits* to the test and fails it, he keeps his driver's license—a result wholly at odds with any notion that summary suspension upon refusal to take the test serves an emergency protective purpose. A suspension for refusal to take the test is obviously premised not on intoxication, but on noncooperation with the police.

The State's basic justification for its summary suspension scheme, as the Court recognizes, *ante,* at 18, lies in the unremarkable idea that a prior hearing might give drivers a significant incentive to refuse to take the test. Related to this argument is the suggestion that the availability of a prior hearing might encourage a driver to demand such a hearing as a "dilatory" tactic, and thus might increase administrative costs by generating a "sharp increase in the number of hearings." *Ibid.* In sum, the State defends the *ex parte* suspension as essential to enlist the cooperation of drivers and also as a cost-saving device. I cannot accept either argument.

The 3-month driver's license suspension alone is obviously sufficient to promote the widespread use of the breath-analysis test, if drivers are informed not only of this sanction for a refusal but also realize that cooperation may conclude the entire case in their favor. Moreover, as is generally the case when a person's ability to protect his interests will ultimately depend upon a swearing contest with a law enforcement officer, the deck is already stacked heavily against the motorist under this statute. This point will not be lost upon the motorist. The State's position boils down to the thesis that the failure to afford an opportunity for a prior hearing can itself be part of the stacked deck. But there is no room for this type of argument in our constitutional system. A State is simply not free to manipulate Fourteenth Amendment procedural rights to coerce a person into compliance with its substantive rules, however important it may

consider those rules to be. The argument that a prior hearing might encourage "dilatory" tactics on the part of the motorist, true as it might be to human nature, is likewise wholly inconsistent with the simple Fourteenth Amendment guarantee that every "person" is entitled to be heard, before he may be deprived of his property by the State. Finally, the all too familiar cost-saving arguments raised by the State have regularly been made here and have as regularly been rejected as a justification for dispensing with the guarantees of the Fourteenth Amendment. For if costs were the criterion, the basic procedural protections of the Fourteenth Amendment could be read out of the Constitution. Happily, the Constitution recognizes higher values than "speed and efficiency." *Stanley* v. *Illinois,* 405 U. S., at 656.

## C

The Court's holding that the Massachusetts breath-analysis suspension scheme satisfies the Constitution seems to be premised in large part on the assumption that a prompt postsuspension hearing is available. But even assuming that such an after-the-fact procedure would be constitutionally sufficient in this situation, the so-called "prompt postsuspension" remedy afforded by Massachusetts is, so far as I can tell, largely fictional. First, the State does not notify the driver of the availability of any such remedy.[4] And without notice, the remedy, even if it exists, is hardly a meaningful safeguard. Only last Term we reaffirmed that "reasonable" notice of a

---

[4] To be sure, the statute states that a driver is entitled to a limited hearing before the Registrar, see Mass. Gen. Laws Ann., ch. 90, § 24 (1) (g) (West 1969), and the parties have stipulated that under Massachusetts practice the driver may schedule this hearing by "walking in" to a Registry Office. The only postdeprivation remedy mentioned in the suspension notice sent to the driver, however, is a right to take "an appeal" within 10 days to the Board of Appeal on Motor Vehicle Liability. The unexplained reason for the appellee's failure to exercise his right to the putative "walk-in" hearing, *ante,* at 7–8, thus may lie in the failure of the State to notify him of any such right.

procedural right is itself integral to due process. *Memphis Light, Gas & Water Div.* v. *Craft,* 436 U. S., at 13–15. This inherent principle has long been established, see *Mullane* v. *Central Hanover Trust Co.,* 339 U. S., at 314, and Massachusetts clearly has not honored it.

Quite apart from the failure of Massachusetts to inform the driver of any entitlement to a "walk-in" hearing, that remedy cannot—as the Court recognizes—provide immediate relief to the driver who contests the police report of his refusal to take a test. To resolve such a factual dispute, a "meaningful hearing" before an impartial decisionmaker would require the presence of the officer who filed the report, the attesting officer, and any witnesses the driver might wish to call. But the State has provided no mechanism for scheduling any such immediate postsuspension evidentiary hearing.[5] The fact is that the "walk-in" procedure provides little more than a right to request the scheduling of a later hearing. In the meantime, the license suspension continues, for the Registrar is without statutory power to stay a suspension founded upon a technically correct affidavit pending the outcome of an evidentiary hearing.

Finally, the Registrar—according to the Court's own description of the Massachusetts scheme—quite possibly does not have authority to resolve even the most basic questions that might be raised about the validity of a breath-analysis suspension. *Ante,* at 15 n. 8. And, if the Registrar has no final authority to resolve the "legal" question the Court perceives in this case,[6] it can hardly be concluded that there

---

[5] An obvious mechanism is suggested by the procedures generally followed for routine traffic offenses. The driver is immediately notified by summons of his right to request a judicial hearing. If a request is made, a date is set, the driver and the police are notified, and the question of liability is then resolved in a single proceeding.

[6] The legal question identified by the Court is whether a delayed offer to cooperate on the driver's part should excuse the suspension penalty. In this case, that question presumably would not arise if the delay had in fact

exists the prompt postsuspension relief that is said to excuse the State from any need to provide a prior hearing. For, if a prompt postsuspension hearing is even to be eligible for consideration as minimally adequate to satisfy the demands of procedural due process, it must provide for an impartial decisionmaker with authority to resolve the basic dispute and to provide prompt relief. See *Memphis Light, Gas & Water Div.* v. *Craft, supra,* at 18.[7]

---

been attributable to the failure on the part of the police to comply with the statutory requirement that the driver be informed of the sanction. If, as the appellee has claimed, this is what happened, the question would be whether a refusal after an improper demand is legally sufficient to justify a suspension.

[7] Indeed, under the Court's description of the postsuspension relief available under the statute, it appears that the appellee was by no means "assured a prompt proceeding *and a prompt disposition of the outstanding issues between [him] and the State.*" *Barry* v. *Barchi, post,* at 66 (emphasis added). This precise constitutional infirmity has led the Court in *Barry* v. *Barchi* to sustain the Fourteenth Amendment claim of a horse trainer whose trainer's racing license was summarily suspended upon a probable-cause showing that his horse was drugged before a race. Here, as in *Barchi,* the appellee was not notified of any right to prompt postsuspension relief. Here, as in *Barchi,* the hearing available upon "appeal" from the administrative summary suspension, see Mass. Gen. Laws Ann., ch. 90, § 28 (West 1969), appears to be the only meaningful postsuspension evidentiary hearing afforded. As in *Barchi,* the statute involved here does not specify when this review must begin, does not require that the suspension be stayed during review, and does not require the Board of Appeal to reach a prompt decision. Further, in view of the Registrar's apparent lack of authority to make any definitive determination of the issues in any evidentiary hearing that the driver might schedule by "walking in," there seems to be no "assurance" under this statute that the driver will receive prompt postsuspension relief from a "trial level" hearing examiner. In sum, under the principle established in *Barchi,* the District Court upon remand for consideration of this appellee's "as applied" challenge to his suspension, *ante,* at 10 n. 6, will be required to sustain that challenge, unless the courts find that the appellee was in fact given advance notice of his right to an immediate postsuspension hearing and was "assured" under the statute of an immediate and definitive resolution of the contested issues in his case.

## D

The Court has never subscribed to the general view "that a wrong may be done if it can be undone," *Stanley* v. *Illinois,* 405 U. S., at 647. We should, in my opinion, be even less enchanted by the proposition that due process is satisfied by delay when the wrong cannot be undone at all, but at most can be limited in duration. Even a day's loss of a driver's license can inflict grave injury upon a person who depends upon an automobile for continued employment in his job.

I do not mean to minimize the importance of breath-analysis testing as part of a state effort to identify, prosecute, and rehabilitate the alcohol-ridden motorist. I cannot, however, agree that the summary suspension of a driver's license authorized by this Massachusetts law is a constitutionally permissible method to further those objectives. For, on the sole basis of a policeman's affidavit, the license is summarily suspended, and it is suspended not for drunken driving but only for failure to cooperate with the police. The State—in my view—has totally failed to demonstrate that this summary suspension falls within any recognized exception to the established protections of the Fourteenth Amendment. Accordingly, I respectfully dissent.