CITY OF DAYTON *v.* RUTLEDGE.

(No. 83 TR C 390—Decided
April 8, 1983.)

Dayton Municipal Court, Traffic Division.

*Mr. Vincent Popp,* assistant city prosecutor, for plaintiff.
*Mr. Jerry A. Spicer,* for defendant.

MERZ, J. This case is before the court upon defendant's motion for reconsideration of this court's pretrial suspension of his license under R.C. 4511.191(K). Defendant asks that the court declare the procedure under that statute unconstitutional.

The questions presented by the motion are questions of first impression. Defendant, Calvin Rutledge, was the first person to have his license suspended by this court under R.C. 4511.191(K). The section became effective at midnight on March 16 and Rutledge was arraigned at approximately 9:15 a.m. Defendant's objections to the statute deserve careful consideration as they relate to this new statute's facial constitutionality.

In order to interpret any statute properly, one must begin with its purpose. See Merz, The Meaninglessness of the Plain Meaning Rule (1979), 4 U. Day. L. Rev. 31. The pretrial suspension provided in R.C. 4511.191(K) was adopted as an integral part of Sub. S.B. No. 432, Ohio's new driving under the influence of alcohol legislation. Initial drafts of the legislation had provided for pretrial suspensions to be imposed by the arresting officer at the roadside if he found certain conditions to be met. During the legislative process, this was changed to require a judicial hearing and findings before a suspension was imposed. However, the General Assembly continued to show its concern for promptness by requiring that the initial appearance at which the suspension is considered is to be held within five days of the arrest. This evinces a firm purpose on the part of the legislature to make the license suspension sanction for driving while under the influence as speedy as possible, consonant with due process of law.

In light of this purpose, R.C. 4511.191 (K) provides:

"If a person is charged with a violation of section 4511.19 of the Revised Code or of a municipal ordinance relating to operating a motor vehicle while under the influence of alcohol and if the results of a chemical test administered pursuant to this section indicate that the blood of the person contained a concentration of ten-hundredths of one per cent or more by weight of alcohol, a concentration of ten-hundredths of one gram or more by weight of alcohol per two hundred ten liters of his breath, or a concentration of fourteen-hundredths of one gram or more by weight of alcohol per one hundred milliliters of his urine, at the time of the alleged offense, or refuses to consent to a chemical test of his blood, breath, or urine to determine alcohol content under this section, the court shall immediately suspend the person's operator's or chauffeur's license or permit or nonresident operating privilege, if the court or referee at the initial appearance, which shall be held within five days from the date of the citation or arrest, determines that one of the following is true:

"(1) The person has previously been convicted of a violation of section 4511.19 of the Revised Code or of a municipal ordinance relating to operating a motor vehicle while under the influence of alcohol;

"(2) At the time of the arrest, the

person's driver's or chauffeur's license or permit or nonresident operating privilege was suspended or revoked;

"(3) The person caused death or serious physical harm to another person;

"(4) The person failed to appear at the initial appearance;

"(5) The court or referee determines that the person's continued driving will be a threat to public safety.

"The suspension shall continue until the complaint alleging a violation of section 4511.19 of the Revised Code or of the municipal ordinance relating to operating a motor vehicle while under the influence of alcohol is adjudicated on the merits by the trial court, or until the trial court, upon motion, determines by a preponderance of the evidence that there was no probable cause for the arrest."

The statute thus provides at least an outline of the process to be followed. At defendant's initial appearance, held within five days of citation or arrest, the court is to consider the results of the chemical test. If the result is of a certain level or the test is refused, the court is to consider the five additional alternative factors. If it finds one of them is true, it is required to suspend the license until trial or until the defendant prevails on a motion to suppress. The hearing is to be held before a judicial officer, either a judge or a referee who must be an attorney. See Traf. R. 14.

The statute is, however, silent on a number of important issues which have to be resolved before hearings under the statute can be held. Does the defendant have a right to be heard himself or by counsel at the initial appearance on the suspension issue? Does he have a right to rebut or cross-examine the evidence against him? Can he insist on formal rules of evidence, excluding hearsay and unauthenticated documents? Is he entitled to an explanation of the court's decision?

In this case, this court resolved those questions as it proceeded at arraignment. On the issue of the chemical test results, the court considered an intoxilyzer machine printout which showed a test result of .17 gram per two hundred ten liters of breath. The document was of course hearsay, no formal foundation for its use was laid, such as would be required at trial, and the only authentication for it was that it was attached to the usual Dayton Police Department alcohol influence forms. The court relied solely on this evidence to conclude the defendant had exceeded the minimum breath alcohol level of .10 gram per two hundred ten liters.

The court found no evidence that defendant was under suspension or revocation or that he had had a prior conviction for driving while under the influence. The court did suspend the defendant's license, however, upon a finding that defendant's continued driving was a threat to public safety. Evidence for this was defendant's ten prior convictions for public intoxication, an August 1982 conviction for possession of dangerous drugs, a 1969 hit-skip conviction, and a 1980 conviction for driving under suspension. The sole evidence for these prior convictions was defendant's "rap sheet," i.e., his record of arrests and convictions maintained by the Dayton Police Department. This document was authenticated in that its source was clear. (Evid. R. 901.) However, it was purest hearsay. While it is an official document, it would not be admissible against the defendant in a criminal case under Evid. R. 803(8).

As the transcript makes clear, the court as it considered this documentary evidence explained to the defendant what it was looking at and gave him an opportunity to refute the evidence or quarrel with its accuracy. There was colloquy between the court and defendant about whether his continued driving was a threat to public safety.

Defendant was not represented by an attorney at his initial appearance. If he had been indigent, counsel would have been appointed for him and would have

been present to represent him at that time. Upon hearing the motion for reconsideration, however, the court permitted defendant's counsel to present any matters which he might have wanted to present initially.

In the court's opinion, the procedure used in this case is appropriate procedure for all cases under R.C. 4511.191(K), at least in this court. The legislature's purpose to require prompt hearings must be meshed with the abilities of this and other municipal courts to provide hearings at arraignment. When the caseloads of our municipal courts are considered, it is clear we cannot give full-blown evidentiary hearings as part of our arraignment process. Arraignments in this court and in most metropolitan municipal courts since the turn of the century have been substantial volume affairs. During 1982, over fourteen thousand criminal cases were filed in this court; over thirteen thousand five hundred traffic cases required a court appearance, and one thousand three hundred ninety-eight driving under the influence cases were filed. Most of these cases involved multiple charges. That means that on an average court day, there were nearly one hundred twenty-one arraignments, conducted either by a judge or by a traffic referee. Traffic arraignments especially are bunched into the traffic appearance session between 4:00 and 5:30 in the afternoon; and by the Superintendence Rules, they must be heard by a referee. The volume is the same or higher in most metropolitan municipal courts. See Ohio Courts Summary, 1977-1981. The legislature cannot have been unaware of this situation, yet it required that R.C. 4511.191(K) hearings be held in this context. If those hearings were to be full-blown evidentiary hearings with live testimony for the foundation for the intoxilyzer and formal proof of prior convictions, the time consumed would seldom be less than an hour apiece. Furthermore, all of the evidence would have to be gathered within the short time between when the prosecutors start work (8:00 a.m.) and the opening of arraignment court (9:00 a.m.). It is difficult enough to gather intoxilyzer reports and rap sheets from within the same building within that time, much less obtain certified copies of prior convictions from perhaps three or four other jurisdictions. If it were necessary to prove formally that the defendant was under suspension, the arraignment could not be held for upwards of six weeks, for that is the amount of time currently necessary to obtain certified records from the Bureau of Motor Vehicles. Given the number of arraignments which must be done and the short time span within which they have to be completed (as a constitutional matter, among other things), they cannot be done with full formal proof. Nor has the legislature given any indication that full formal proof is intended, for nothing is said in R.C. 4511.191(K) about the manner of proof for the factual findings the court must make. If the hearing must be held within hours of the arrest, it is simply impossible to proceed by full formal proof.

The Rules of Evidence also suggest that full formal proof is not required. Evid. R. 101(C)(3) makes the rules inapplicable to:

"Miscellaneous criminal proceedings. Proceedings for extradition or rendition of fugitives; sentencing; granting or revoking probation; issuance of warrants for arrest, criminal summonses and search warrants; and provisions with respect to release on bail or otherwise."

Many of these proceedings involve liberty interests much more important than the temporary suspension of a driver's license; and many of them occur at arraignment proceedings, yet no requirement is imposed of full formal proof.

Having decided what process the statute requires, we must decide whether it is sufficient "due process" to meet Fourteenth Amendment standards.

For the Fourteenth Amendment to be applicable at all to state deprivation of a personal interest, that interest must be a

protectible property or personal interest. But the Supreme Court has already decided that a person's interest in his or her driving privileges, even pending a hearing, is such a protectible interest. *Mackey* v. *Montrym* (1979), 443 U.S. 1; *Dixon* v. *Love* (1977), 431 U.S. 105; *Bell* v. *Burson* (1971), 402 U.S. 535.

Having decided that due process standards are applicable, we must inquire what process is due. The factors to be considered are set forth in *Mathews* v. *Eldridge* (1976), 424 U.S. 319, at 335:

"First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."

In *Mackey* v. *Montrym, supra,* the Supreme Court applied these factors in evaluating the Massachusetts statutory scheme of implied consent suspension and upheld the procedure. It is the court's opinion that the Ohio procedure in R.C. 4511.191(K) provides substantially more due process than the Massachusetts scheme and is thus clearly constitutional under *Mackey.* In fact, it appears that the Ohio procedure meets all the objections raised by the dissent in *Mackey* and its constitutionality should be beyond reasonable question.

In Massachusetts, a person who refuses a breath analysis test will have his driver's license immediately suspended by the registrar of · motor vehicles on the basis of an affidavit by the arresting officer of the operative facts: arrest for driving under the influence upon probable cause and refusal of the test after warning of the consequences. Upon receipt of this affidavit, the registrar is required to suspend the license without a prior hearing. Although a post suspension hearing is theoretically immediately available before the registrar, a defendant is not notified of this fact and the registrar has no authority to hold the license suspension in abeyance pending presentation of evidence or a decision on the issues raised by the defendant. In effect, the legislation requires suspension on the uncross-examined, uncorroborated, and uncontradicted affidavit of a police officer. Furthermore, while the legislation is justified on grounds of removing drunk drivers from the highways, it is in reality only a penalty for not cooperating with the police, since those who take the test and fail it are *not* suspended. *Mackey, supra,* at 26 (Stewart, J., dissenting).

The Ohio statute, as construed by this court, is substantially less arbitrary. No suspension occurs at all until there has been a hearing before a neutral magistrate at which the driver must be present (Crim. R. 5 and Traf. R. 8[C]). The driver hears what the evidence against him is; and although it is hearsay, he has a chance to respond to it, criticize it, and offer contrary evidence. He has a right to be accompanied by his attorney; and if he is indigent, an attorney will be appointed for him and will, in fact, be present at the same time, since the public defender's office is represented at all times in arraignment court. In this particular case, the defendant had not yet contacted his attorney and did not ask for a continuance to obtain one. Once he had secured counsel, he was given an additional evidentiary hearing as soon as his counsel wanted it and was prepared for it. Finally, this statute treats those who take the test and those who refuse equally: both are subject to immediate suspension at initial appearance if they satisfy one of the other five criteria.

Defendant complains that the court's initial decision was based on hearsay, but there is no constitutional rule forbidding making license suspension decisions on the basis of hearsay. The registrar's decision in Massachusetts, in the procedure

approved in *Mackey,* was based on pure hearsay. Furthermore, the hearsay utilized in this case is far more likely to be reliable than that approved in *Mackey.* There, the registrar relied upon the uncorroborated statement of a police officer about the whole transaction. Here, at least where a test is taken, the principal hearsay is the machine printout from the intoxilyzer, a scientific test result unaffected by subjective impressions as an affidavit of refusal would be. Of course, if this defendant had refused the test, we would be confronted with a situation similar to that in *Mackey,* but the evaluation of the hearsay would be by a decision maker more neutral, and with more discretion to withhold sanctions than the registrar in *Mackey.* The second source of hearsay in this case, the report of convictions, regularly maintained by the Dayton Police Department, is recognized by the dissent in *Mackey* as more reliable than the affidavit of test refusal. Justice Stewart made that observation in distinguishing the *Mackey* situation from the pre-hearing "points" suspension approved in *Dixon* v. *Love, supra.* Finally, the Supreme Court has explicitly approved a reliance on reliable hearsay in other contexts. *Richardson* v. *Perales* (1971), 402 U.S. 389.

We may offer our own measure of the R.C. 4511.191(K) procedure against the *Mathews* v. *Eldridge* test:

(1) The interest of the driver in continuing to drive pending trial is significant, but time-limited. As in *Mackey,* where the implied consent suspension was for ninety days, so here a pretrial suspension would only be for ninety days at most, given the speedy trial rules. Certainly the interest is no more important than that in liberty which can be taken away temporarily at bail and sentencing hearings at which hearsay and unauthenticated documents can be used;

(2) The procedure used is less likely to yield an erroneous result than many used in the criminal process, while the alternatives are not likely to yield better results. For example, we could require a full formal foundation for the intoxilyzer test, as we do at trial. But in the court's experience, this foundation is rarely challenged and even more rarely defective. "Rap" sheets and BMV printouts are more suspect, but defendants are given a chance to respond to what may be erroneous information;

(3) The alternatives suggested by defendant would place an insuperable fiscal and administrative burden on the state, which simply could not assemble all the live witnesses and verified documents in time to hold a hearing in such a way as to satisfy the state's interest in prompt removal of intoxicated drivers from the highways.

Thus, I believe the procedure in R.C. 4511.191(K) satisfies present procedural due process standards. I note that the present Supreme Court's approach to procedural due process issues, as elaborated in *Mathews* v. *Eldridge, supra,* has been criticized as too instrumental, too concerned with the reliability of the result, and too little concerned with the philosophical basis of procedural due process: the right of the individual to be treated as a person by the decision maker. Tribe, American Constitutional Law (1978), Section 10-19.

I agree with this criticism. It appears to me that the strength of our procedural due process tradition is in its respect for and protection of the personhood of the litigant. But a personalistic due process should not be carried all the way to constitutionalizing every bit of procedure ordinarily associated with a full-blown criminal jury trial, including all the elaborate tangles of the evidence law. If courts insist on constitutionalizing all of the evidence law, they will find legislatures turning to alternative adjudicators, as the Massachusetts legislature did with its implied consent statute. Just as the Supreme Court majority enshrined *laissez*

*faire* economics in the Constitution in *Lochner* v. *New York* (1905), 198 U.S. 45, and ultimately brought on a constitutional crisis, so too will we weaken the judiciary and ultimately the cause of due process if we over-constitutionalize our customary way of doing things. We can acknowledge that the usual rules of evidence are functional in protecting the judicial process without finding they are "of the very essence of a scheme of ordered liberty." *Palko* v. *Connecticut* (1937), 302 U.S. 319, 325.

Defendant in this case was given a fair hearing before a neutral magistrate before suspension at which he had an explanation of the evidence against him and of the court's decision. He had a prompt rehearing as soon as his counsel was available. The Constitution requires no more. The motion to declare the statute unconstitutional is overruled.

*Motion overruled.*