## Commonwealth v. Miller

*Rosamond A. Presby,* assistant district attorney for Commonwealth.

*Robert C. Rowe,* for defendant.

GATES, *P.J.,* April 5, 1984—

## HISTORY

On September 7, 1983, defendant was charged with having, on that date, operated a motor vehicle while under the influence of alcohol to a degree that rendered him incapable of safe driving and with driving while the amount of alcohol by weight in his blood exceeded .10, to wit, .19.

After a preliminary hearing, defendant was bound over for court. At arraignment he entered a plea of not guilty. Thereafter, defendant filed an omnibus pretrial motion to suppress the results of the Breathalyzer test. We held a hearing on February 3, 1984. From that hearing we make the following

## FINDINGS OF FACT

On the evening of September 23 and the early morning hours of September 24, 1983 the Pennsylvania State Police, operating out of the Jonestown Barracks, set up a check point on Route 72 in Union Township, Lebanon County, Pa. Trooper Gerald I. Rockett and three other troopers were working a program which is commonly known as DUI, an acronym for driving under the influence, a federally funded project that was designed to detect and apprehend intoxicated operators.

Pursuant to the program, a check point was set up on Route 72 and the troopers stopped all traffic, both traveling south and traveling north. At approximately 12:30 a.m. the troopers had stopped a line of vehicles traveling south. Trooper Rockett approached a vehicle driven by the defendant Barry Miller. As he spoke to the defendant he detected an odor of alcoholic beverages coming from within the vehicle and from his breath. On the passenger's seat he observed a beer mug which contained a small portion of amber colored liquid which the Trooper surmised was beer.

The trooper observed that the defendant's face resembled someone in sort of a stupor. After securing the defendant's operator's license and registration card defendant was advised of his Miranda warnings and asked if he would consent to a basic field sobriety test. Defendant agreed. Defendant failed the so-called "heel-to-toe" test. He only performed fairly the test known as the "finger-to-nose" test. He also did fairly by standing erect and leaning back. At that point the trooper advised defendant that he had reason to believe he was operating under the influence and placed him under arrest and transported him to the Jonestown Barracks for the purpose of administering a Breathalyzer test.

At the barracks defendant was again given the heel-to-toe test and it was performed poorly. The Breathalyzer test was administered and the results revealed a .19 percent blood alcohol content. During the preparation of the drunk driving report defendant admitted that on the previous Saturday evening he had been drinking since 7:00 p.m. and had consumed between ten and eleven ten ounce glasses of beer.

The trooper did not observe defendant driving in any erratic manner.

Defendant now contends that the results of the Breathalyzer test should be suppressed for use as evidence because it is an unconstitutional intrusion of his privacy in violation of the United States and Pennsylvania Constitutions.

We begin our analysis by noting that probably the most important governmental function is the exercise of the police power for the purpose of preserving the public health, safety and welfare. In carrying out this function we must bear in mind that the police power is one of the least limitable and is particularly broad in matters pertaining to the safety and efficient functioning of the highways. Maurer v. Boardman, 336 Pa. 17, 7 A.2d 466 (1939); Mackey v. Montrym, 443 U.S. 1, 99 S.Ct. 2612, 61 L.Ed.2d 321 (1979). Perhaps the strongest exercise of police powers is in matters pertaining to the sale, consumption and regulation of alcoholic beverages. Commonwealth v. Koczwara, 397 Pa. 575, 155 A.2d 825 (1959).

Our legislature has recognized that drunken driving is a large area where police powers should be vigorously employed in an attempt to halt, or at least to retard, the wanton and senseless slaughter of and injury to innocent people upon our highways caused by drunk drivers. Commonwealth v. Mikulan, _____ Pa. _____, 470 A.2d 1339 (1983).

In balancing the constitutional right of privacy and the proper exercise of police powers, the United States Supreme Court has spoken. In Delaware v. Prouse, 440 U.S. 648, 99 S. Ct. 1391, 59 L.Ed.2d 660 (1979) it was held that random spot checks for motor vehicle violations are unconstitutional and ruled that a police officer may not stop a vehicle at random without ". . . at least articulable and reasonable suspicion that a motorist is unlicensed, or that an automobile is not registered, or that either the ve-

hicle or an occupant is otherwise subject to seizure for violation of law . . ." In arriving at their decision, the court noted:

". . . This holding does not preclude the State of Delaware or other States from developing methods for spot checks that involve less intrusion or that do not involve the unconstrained exercise of discretion. Questioning of all oncoming traffic at roadblock-type stops is one possible alternative. . . ."

The court suggested roadblocks (we prefer the term "safety check points") as a possible alternative to random spot checks because the court felt that stopping a vehicle on a roadblock involves less intrusion on an individual's Fourth Amendment rights, including privacy, than random spot checks for motor vehicle violations.

In Texas v. Brown, _____ U.S. _____, 103 S.Ct. _____, 75 L.Ed.2d 502 (1983) a police officer stopped defendant at a routine driver's license check point and seized a balloon containing illegal narcotics that was in plain view within the automobile. In upholding defendant's conviction and the use of the seized evidence, the Supreme Court noted:

". . . The Court of Criminal Appeals stated that it did not 'question . . . the validity of the officer's initial stop of appellant's vehicle as a part of a license check,' . . . and we agree. Delaware v. Prouse (citation omitted)." Id. at 75 L.Ed.2d 512.

Following Brown, the court held that customs officials, acting pursuant to a federal statute and without any suspicion of wrong-doing, may board for inspection of documents, a vessel located in water providing ready access to open sea. U.S. v. Villamonte-Marquez, _____ U.S. _____, _____ S.Ct. _____, 77, L.Ed.2d 22 (1983). In articulating the rea-

sons for its decision, the Court reiterated the following principles:

"Random stops without any articulate suspicion of vehicles away from the border are not permissible under the Fourth Amendment, United States v. Brignoni-Ponce, Supra., Delaware v. Prouse, Supra., but stops at fixed check points or at road-blocks are."

In a case arising out of an opinion of this court, the Pennsylvania Supreme Court held that random spot checks of automobiles by police officers are unconstitutional. However, it carefully footnoted as follows:

"This opinion should not be read as applicable to systematic stops or roadblocks for detection of Motor Vehicle Code violations. The issue of the validity of systematic stops of a large number of cars is not now before the Court." Commonwealth v. Swanger, 453 Pa. 107, 307 A.2d 875 (1973). See Footnote 3.

While the Pennslyvania appellate courts have not directly ruled on the constitutionality of police roadblocks for the detection of motor vehicle violations, the Swanger footnote suggests that the Pennsylvania Supreme Court would uphold such roadblocks should the issue come before it.

The mood in this Commonwealth as reflected by the legislature's recent enactment of amendments to the DUI law, with its per se violations and mandatory jail sentences, suggests that any court in balancing an individual's rights of privacy as against societal interests in providing for the enforcement of laws designed for the protection of the community, buttresses this conclusion.

We suggest that the legislature has determined it is unlawful to operate a motor vehicle when the blood alcohol content in the motorist is .10 or greater and insists upon its enforcement. As an alterna-

tive to awaiting the happening of an accident by an intoxicated motorist or its precedent erratic driving, safety check points seem to be the only viable method of enforcing the per se violation. However, safety check points themselves may impose some hazard on the motoring public. The National Highway Traffic Safety Administration has recently published a report that recommends procedures for drinking/driving safety check points. See: "The Use of Safety Check Points for DUI Enforcement", DOT-HHS-806-476 (September, 1983). While the ten suggestions are directed to the Legislature primarily, it tacitly acknowledges the constitutional validity of safety check points.

From the record before us we are informed that the four Pennsylvania State Policemen were assigned to carry out a program commonly known as the DUI, a federally funded project designed to detect and apprehend intoxicated operators. The troopers set up a check point on Route 72, just north of Township Route 601 in Union Township, Lebanon County. They stopped all traffic traveling both south and north on Route 72. The safety check point was at a place where there was a wide portion of the berm where the cars were stopped and, in this case, the field sobriety tests conducted. There is nothing in this record to indicate that the safety check point itself posed a hazard to the motoring public.

We would take this occasion to suggest that, unless or until the legislature speaks to the subject, the State Police and Municipal Police Departments should establish written policy guidelines concerning safety check points which outline how roadblocks are to be conducted prior to widespread use. They should be planned in advance with the safety of motorists foremost in the written policy guide-

lines. Care should be taken in the site selection. If every vehicle is not to be stopped, the method used to determine which ones will be stopped should be determined in advance by a written policy. For example, on a busy highway, perhaps it would be wise to stop only every fifth or tenth vehicle. However, to avoid the suggestion that that is random stopping, the policy should be in the form of an administrative order authorizing the use of safety check points and the method of stopping the vehicles.

In addition we would suggest that an advance warning should be provided to approaching motorists to insure alertness on their part and the safety of other motorists and the police officers themselves. This could be accomplished by signs, flares or police cars with warning lights flashing. Of course, the officers should be in uniform displaying badges of authority.

We further suggest that portable blood testing equipment be employed where possible. In the alternative, a system for expeditiously transporting suspected DUI candidates to chemical test sites must be established.

Finally, but not exhaustively, to receive the maximum benefits from a safety check point program, it should be aggressively publicized. Most motorists will likely never encounter a check point, but will learn of it through media reports. The fact that the program of safety check points is in operation without disclosing its location may very well be a far greater deterrent than the knowledge of mandatory jail terms for convictions.

We acknowledge that our suggestions may be presumptuous. However, the dangers inherent in drunk driving render our suggestions a matter of soft impeachment.

## ORDER OF COURT

And now, April 5, 1984 in accordance with the accompanying opinion and in obedience to our order of March 30, 1984, defendant's motion to suppress is denied.

## ORDER

EBY, *J*, And now, May 11, 1984, the motion of the district attorney for Accelerated Rehabilitative Disposition is granted. Defendant is accepted into the program and placed on probation with the Lebanon County Probation Office upon the following conditions:

1. That he be of good behavior and obey the law and the rules and regulations of the Lebanon County Probation Department for a period of nine months;

2. That he pay the costs of these proceedings;

3. That he pay toward the administrative costs of the program the sum of $50 per month during the period of his probation;

4. That he attend and satisfactorily complete the Alcohol/Safe Driving Program and contribute the sum of $75 toward the costs of its administration;

5. That he surrender his operating privileges and driver's license to the Pennsylvania Department of Transportation for a period of 60 days, the period of surrender to be at a time set by the Pennsylvania Department of Transportation;

6. That he comply with any and all recommendations flowing from the evaluation prepared by the Lebanon County Commission on Drug and Alcohol Abuse;

7. All administrative costs, the costs of these proceedings and the tuition for Alcohol/Safe Driving

Program must be paid in no less than equal monthly installments during the term of the program.

It is ordered that further proceedings upon the charges contained within the information shall be postponed during the term of the program. Should defendant violate any term or condition of the program, the charges will be re-presented to the court for further proceedings as provided by law. When defendant has satisfactorily completed the program, upon his application, the court will enter an order dismissing the charges.