SHARPE, APPELLANT, *v.* BUREAU OF MOTOR VEHICLES, APPELLEE.*

_____
* Reporter's Note: No appeal has been taken from the decision of the court.

(No. 88-CV-N-182—Decided May 17, 1988.)

APPEAL: Bowling Green Municipal Court.

*Peter T. Halleck,* for appellant.
*Mark Reddin,* for appellee.

BACHMAN, J. This is an implied consent appeal brought by Randall N. Sharpe ("Sharpe"), petitioner, after the Registrar of the Bureau of Motor Vehicles ("bureau" or "registrar"), respondent, suspended his license from February 9, 1988 to February 9, 1989, pursuant to R.C. 4511.191, because of petitioner's refusal to take a chemical test for alcohol after his arrest for drunk driving.

According to the registrar's affidavit (which he furnished to the court, pursuant to R.C. 4511.191[G][1]), the notice of the license suspension was mailed to Sharpe on or before January 20, 1988. Sharpe did not timely file his petition within twenty days after the bureau mailed him its notice of suspension. Therefore, at the hearing on his petition, he presented no evidence or argument concerning certain errors and other matters alleged in his petition, which with a timely filed petition would have been allowed by R.C. 4511.191(D), (F), and (G)(1) to (5).

Instead, he properly concentrated on the sole issue here, namely: whether there is "reasonable cause to believe that suspension would seriously affect

[Sharpe's] ability to continue his employment." If so shown, the court may grant him occupational driving privileges during the remainder of the above suspension period. R.C. 4511.191(G)(6) and (7).

After hearing this case on May 6, 1988, the court took it under advisement.

The court views this case, as it does all implied consent cases, with the objective of doing everything it legally can to uphold the legislative mandate that the criminal justice system detect suspected drunk drivers and discourage their refusals to submit to chemical tests (for alcohol in their bodies). See this court's discussion in *Cheatwood* v. *Bureau* (June 12, 1987), Bowling Green Mun. Ct. No. 87-CV-N-214, unreported, at 1-3, affirmed (Mar. 4, 1988), Wood App. No. WD-87-51, unreported.

No person has a constitutional right to refuse to submit to a chemical test for alcohol in his body when a peace officer arrests him upon probable cause to believe that he has been driving under the influence of alcohol and who demands that he submit to the test without the issuance of a search warrant. *Schmerber* v. *California* (1966), 384 U.S. 757. Furthermore, if that person refuses to submit to the test, he has no constitutional immunity from being penalized by receiving the imposition of a driver's license suspension. *Mackey* v. *Montrym* (1979), 443 U.S. 1.

On the other hand, that driver does have the statutory right to refuse to submit to that test. But, there is a penalty: a one-year driver's license suspension, subject only in some cases to a grant of occupational driving privileges. R.C. 4511.191 ("the implied consent" law).

The enormous threat that drunk drivers pose to public safety on and off our roadways, and the extensive hurt that many of them inflict on themselves and innocent others, need not be repeated here.

The General Assembly's response — by passing the prohibited alcohol concentration statute in 1983 (139 Ohio Laws, Part I, 927, 945-947) — is well known and has been effective. However, its effectiveness will remain only as long as suspected drunk drivers submit to a chemical test for alcohol in their bodies. By refusing the test, they can defeat the statute.

All of Ohio's trial courts realize this, and most have responded by no longer allowing wholesale plea bargains in the criminal cases or automatic occupational driving privileges in the civil (implied consent) cases. Because of legislative mandate and trial court philosophy, the refuser now has to bear the burden, and in many cases suffer the consequences, of his refusal to take the test.

And so it should be, because after all he does have an alternative at the time the police ask him to take the test. Instead of rejecting the police test, he can take it, and then seek to obtain his own test or tests by "a physician, a registered nurse, or a qualified technician or chemist of his own choosing." R.C. 4511.191(B), sixth paragraph.

By taking one or more chemical tests, the suspected drunk driver can better establish his innocence or the state can better establish his guilt. He should take the test. That is what the law says. R.C. 4511.191(A).

The law is a good law, and it is fair and effective. Accordingly, if the law allows this petitioner to receive occupational driving privileges, he will receive them; if it does not, he will not.

In that regard, R.C. 4511.191(G) provides in part:

"(5) The court may, if it finds reasonable cause to believe that suspension would seriously affect the person's ability to continue in his

14

employment, grant the person occupational driving privileges during the period of suspension imposed pursuant to division (D) of this section."

In *Cheatwood, supra,* at 4-5, this court has already interpreted the word "seriously" in the phrase "would seriously affect the person's ability to continue his employment." In that case, this court — noting that some term of lesser degree, such as "substantially," was not used — held that "seriously" meant "gravely." Hence, would suspension seriously or gravely affect the person's ability to continue his employment?

In an implied consent appeal case, the burden of proof is upon the petitioner (Sharpe, here). This means that he has both the burden of production (producing sufficient evidence) and the burden of persuasion (persuading the court, as the fact finder). See *Newlove v. McCullion* (June 1, 1987), Bowling Green Mun. Ct. No. 87-CV-N-210, unreported, at 1-2.

The court has considered the witnesses' testimony, as well as the registrar's filed affidavit, pursuant to R.C. 4511.191(G)(1) and (2). Additionally, the court has taken judicial notice of certain geographical facts (namely, addresses and distances) per Evid. R. 201(B), by resorting to a Wood County Engineer's map of Wood County and a GTE telephone directory.

Findings of Fact

Based upon a greater weight of the believable evidence, the court finds these facts:

1. Sharpe lives at 12809 Mermill Road, Portage, Ohio. Mermill Road intersects State Route 25. That intersection is just south of Portage, Ohio (which itself is just south of Bowling Green, Ohio).

2. Sharpe works at two businesses located near the north edge of the city limits of Bowling Green, Ohio.

3. The one business is Dixie Auto Parts ("Dixie Auto") which is situated just outside the north edge of Bowling Green. The other business is Henry Filter, Inc. ("Henry Filter") which is situated just inside the north edge of Bowling Green.

4. Dixie Auto is located at 17581 North Dixie Highway (which is State Route 25), at the Bishop Road intersection. It is about one-half mile north of the north city limits line.

5. Henry Filter is located at 1350 Van Camp Road, which intersects North Main Street (State Route 25). It is about one-half mile south and west of the north city limits line.

6. The distance between Dixie Auto and Henry Filter is about one mile, or about three to four minutes' driving time.

7. The distance between Sharpe's home, on Mermill Road; and either Dixie Auto or Henry Filter, is about eight miles, via State Route 25.

8. Since March 14, 1988, Sharpe has not been driving, pursuant to the bureau's notice of suspension which he received on or about that date.

9. Sharpe has worked at Dixie Auto for about one and one-half years. Dixie has two employees (Sharpe and Jim Adams). Sharpe grosses $244 per week and he works no overtime. He is a good worker.

10. Sharpe's boss (Mr. Levitin) worries about whether Sharpe will be at work and he believes that Sharpe has attendance problems. (He gave no specifics.) Also, he feels that if Sharpe is not granted driving privileges he, Levitin, will have to start looking for a replacement. (Again, he gave no specifics.)

11. Sharpe works at Dixie Auto from 9:00 a.m. to 5:00 p.m., Monday through Friday.

12. Apparently, Sharpe's wife drives him to work.

13. As to Sharpe's need to drive while on the job at Dixie Auto, it would

— according to his boss (Levitin) — "be convenient," but not really necessary.

14. After work on the weekdays, Sharpe gets a ride to his second job (at Henry Filter) by the boss at his second job (Mr. Hook).

15. Hook works days at Speck's Sales, and apparently gets off at 5:00 p.m. Speck's is located at 17746 North Dixie Highway (State Route 25), about two tenths of a mile north of Dixie Auto.

16. On his way to Henry Filter, Hook drives right by Dixie Auto. He stops there to pick up Sharpe at 5:00 p.m., and then drives him the short distance to Henry Filter.

17. Sharpe has worked at Henry Filter for the last six months. He works with five or six other employees. He is a good worker.

18. Sharpe's boss (Hook) believes that Sharpe is late to work once a week.

19. Sharpe works at Henry Filter from 5:00 p.m. to 10:00 p.m. on Saturday. He punches a time clock.

20. Sharpe has no need to drive while on the job at Henry Filter, according to his boss (Hook).

21. After work at Henry Filter, Sharpe's fellow worker (Jim Duty) or Sharpe's wife takes him home.

22. Apparently, on Saturday, when Sharpe is not working at Dixie Auto, his wife drives him to Henry Filter.

### Conclusions of Law

The court concludes that Sharpe has failed to meet his burden of proof. He has not shown that a suspension would seriously or gravely affect his ability to continue his employment at his regular job (Dixie Auto) or his secondary job (Henry Filter).

First, Sharpe's evidence shows that neither of his bosses believes that Sharpe needs to drive on the job. And, there is no evidence that on-the-job driving is a part of his job descriptions.

Second, Sharpe's evidence in finding No. 10, given through the testimony of his Dixie Auto boss (Levitin), is of no weight. That evidence is imprecise and vague. Sharpe did not show the basis for Levitin's worries, beliefs, and feelings, mentioned in that finding. Are they justified or just imagined?

The court has other questions. How often was Sharpe late to work at Dixie Auto? How late was he? Why was he late? Levitin was not asked these or related questions. And, although Sharpe was in court and could have testified, he did not. Sharpe's wife did not testify either. Likewise, where was Sharpe's attendance record? It was never introduced into evidence.

Too many questions are left unanswered. Accordingly, Sharpe has not met his burden of proving that his driver's license suspension will seriously or gravely affect his ability to continue his employment with Dixie Auto.

Third, Sharpe's evidence in finding No. 18, given through the testimony of his Henry Filter boss (Hook), is specific, but of little weight. That evidence is incomplete and insufficient. Sharpe did not show the circumstances related to his being late once a week.

How late was he? On what day or days was he late (Monday through Friday when Hook brought him to work, or on Saturday when his wife brought him)? Why was he late? Hook was not asked these or related questions. Sharpe did not testify. He never introduced into evidence his time clock punch card.

Too much evidence is missing or insufficiently presented. Accordingly, Sharpe has not met his burden of proving his allegation that his driver's license suspension will seriously or gravely affect his ability to continue his employment with Henry Filter.

Hence, the court concludes that the license suspension will not seri-

ously or gravely affect Sharpe's ability to continue his employment at either job.

### Conclusion

Sharpe's petition must be dismissed at his costs. The bureau's action in suspending his license from February 9, 1988 to February 9, 1989 is upheld.

If Sharpe were to drive during that period, he would be in violation of R.C. 4507.02(D). This is a first degree misdemeanor, carrying a possible $1,000 fine and/or six months in jail and/or a one-year driver's license suspension.

Sharpe's decision not to take the chemical test is a costly one. Now — for nearly a year to come — he must abide by that decision, while he is without any driving privileges whatsoever. He could have taken the police officer's test, as well as another test thereafter by some qualified person of his own choice. Hopefully, he will not ever find himself charged again with drunk driving. But if he does, the court's action today ought to cause him to do what the legislature intended: upon a police officer's demand, submit to the chemical test.

The court will prepare, file, and serve its judgment entry, consistent with this decision.

*Judgment accordingly.*