VALIHURA, Justice,
concurring in the judgment:
The Court holds that “Officer Gaul had reasonable and articulable suspicion to stop West’s car and investigate whether she was driving while impaired.” It reasons that “weaving, coupled with the sharp swerve to avoid hitting a concrete island is easily recognized as driving behavior indicative of drunk driving.” I respectfully disagree. . Rather, I believe that the stop was justified based upon Officer Gaul’s reasonable mistake of fact in suspecting that West had failed to remain within a single lane multiple times over the course of traveling three to 'four miles on Route 273. Thus, I concur in the result only because it was objectively reasonable for a law enforcement official in Officer Gaul’s position to think that West violated Delaware law by failing to remain within her lane.
We are in agreement that a traffic stop is a “seizure” of the occupant of the vehicle and must be conducted in accordance with the Fourth Amendment to the United States Constitution.[1] We also agree that in order to justify such a seizure, “officers need only ‘reasonable suspicion’ — that is, ‘a particularized and objective basis for suspecting the particular person stopped’ of breaking the law.”[2] But the Majority and I differ as to which suspected violation of law should be the basis for the stop. This matters because it affects the nature of the investigation that can be performed thereafter. Here, Officer Gaul" had a reasonable, but mistaken,, belief that, West, had failed to remain within her lane.
In Heien v. North Carolina,[3] Chief Justice Roberts, writing for the United States Supreme Court, stated: “We have recognized that searches and seizures based on mistakes of fact can be reasonable.”[4] Officer Gaul’s reasonable mistake of fact gave him “a particularized and objective basis for suspecting” West of breaking the law and, therefore, justified the traffic stop.[5]
*720 My view is that a reasonable suspicion of driving under the influence did not develop until after Officer Gaul made contact with West.[6] The Majority holds that a reasonable suspicion of driving under the influence existed prior to the stop. I believe that my reasoning is more closely tethered to what actually happened in this case. If West had not shown signs of intoxication upon being stopped, her detention would have been limited constitutionally to addressing the lane violation — a DUI-focused detention would have been unreasonable,[7] since a traffic stop must be “reasonably related in scope to the circumstances which justified” the initial stop.[8] Neither the arresting officer nor the trial court went as far as this appellate court in finding that the observable facts preceding the initial traffic stop provided a particularized and objective basis for suspecting West of the more serious crime of driving under the influence.[9]
I see several problems arising from the Majority’s reasoning. The Court’s holding sets a new and very low bar to justify a traffic stop for driving under the influence. It appears to conflict with other decisions of this Court that say more is needed to seize a citizen for reasonable suspicion of driving under the influence. For example, in Lefebvre v. State[10] this Court observed:
*721 [T]he commission of a traffic offense combined with an odor of alcohol, standing alone, do not constitute probable cause to arrest for a DUI offense. Nevertheless, those two facts may give rise to a reasonable suspicion of DUI and justify a request that the driver perform some field sobriety tests. The driver’s performance on those tests may give rise to facts that either elevate what was only a suspicion into probable cause, or dispel the suspicion and result in no DUI arrest.[11]
Here, the odor of alcohol and other signs of intoxication were not apparent until after West was stopped.
The practical difference between my view and that of the Majority concerns the nature of the investigation that can be performed after the traffic stop. An investigative detention must be delineated in time and scope to effectuate the purpose of the stop.[12] If a citizen is suspected of a traffic violation — for example, failing’ to maintain a single lane — the detention must be limited to addressing that violation (presumably by issuing a ticket, a warning, or letting the operator go).[13] Thus, under my reasoning, based upon the observable events leading to the stop in this case, a driver would not be subject to a DUI-related investigative detention, including field sobriety tests — unless, as in the instant matter, there were signs of intoxication that became evident after the stop. But under the Majority’s reasoning, a driver would be subject to field sobriety tests based upon legal conduct occurring prior to a stop. The Majority and I agree on the result only, because if a citizen is pulled over for failure to maintain a lane and the officer thereafter notices an odor of alcohol, then, as we said in Lefebvre, those facts might give rise to a reasonable suspicion that the operator is driving under the influence. That is what happened here.
The Majority attempts to cabin the effects of its holding by stating that if suspicion of driving under the influence is the basis for the stop, that does not mean the officer can conduct field sobriety tests. It states:
As we emphasized in Bloomingdale v. State, the clearance to conduct an investigative stop “does not mean that the officer can go further and require a sobriety test in the absence of additional evidence that provides a reasonable basis for that action. It simply means that the officer ought to be able to make- a brief stop to inquire about the driver’s fitness to operate a vehicle, given the *722 public interest in ensuring that unsafe drivers be taken off the road promptly.” The Superior Court correctly held that reasonable suspicion- existed to stop West for possible driving-under ’the influence.
Bloomingdale supports my view. The suspected violation there was not driving under the influence, but rather “moving violations.”[14] As the Bloomingdale Court said, “once [the defendant] stopped his car, [the officer] quickly developed reasonably suspicion supporting his administration of sobriety tests. He smelled alcohol emanating from the vehicle, he observed empty alcohol containers in the car, and [the defendant] admitted that he had been drinking.”[15] There, we held that a reasonable suspicion that the defendant was driving under the influence developed after the stop for moving violations. In the instant matter, the Court concludes, based upon conduct that was not a violation of law, that there was reasonable suspicion of driving under the influence prior to the stop.
By attempting to avoid the undesirable result of -its conclusion — that a reasonable suspicion of driving under the influence justifies a more intrusive DUI-related investigative detention — the Majority runs head-first into the long line of cases that say that the scope of the detention and investigation must be tailored to the purpose of the stop. The Majority’s attempt to soften that blow is inconsistent with this established case law, as well as Bloomingdale. Instead, it is more consistent with the application of the community caretaker doctrine, permitting an -officer to seize a driver simply to inquire about his or her fitness to operate an automobile.[16]
A. Factual and Procedural Background
In my view, justifying the stop based upon Officer Gaul’s mistaken belief that West had committed a moving violation is more consistent with what happened in this case. At approximately 2:00 a.m. on June 22, 2014, Officer Gaul observed a vehicle traveling westbound on Route 273 that “was kind of driving a little bit erratically.” The vehicle was “drifting back and *723 forth in the lane.” In the course of traveling toward Route 1, the vehicle tagged the fog and center lines on multiple occasions. The vehicle, according to the officer, weaved within its lane. “[s]everal times over a distance of three to four miles” and, at one point, struck the shoulder of the roadway. When it reached an on-ramp to enter Route 1 .northbound, it made a sharp turn .to avoid colliding with a concrete island in the roadway. Officer Gaul then activated -his emergency equipment and conducted a traffic stop.
At the time when Officer Gaul pulled West over, it was not his intention to write her a ticket. Rather, according to the officer, the purpose of the stop was to perform “a welfare check,” in part because it was 2:00 a.m. and “operators are tired or whatever.” Upon making contact with West, and after further investigation, Officer Gaul arrested her for driving under the influence and for making an illegal lane change.[17]
At the hearing on West’s motion to suppress, Officer Gaul testified that he believed that West had failed to maintain her lane when she narrowly avoided colliding with the median adjacent to the Route 1 on-ramp.[18] While the video of the incident captured by the officer’s patrol vehicle did not actually show that West had failed to maintain her lane, Officer Gaul testified that there were also lane violations that preceded the video recording, as the video only captured a portion of the time he followed West. When asked whether the video indicated that West drove on the shoulder of the roadway, Officer Gaul testified as follows: “Well, as I testified!,] there’s actually!] what I observed before the video started. ’Cause when I activated my emergency equipment!,] that’s when the video came back.” Further, he testified that when he began following West, he did not have reasonable, suspicion to stop her, “[b]ut as distance increased, yes, there was reasonable suspicion.”
*724 After viewing the video recording of the incident during the hearing on the motion to suppress, Officer Gaul could not say for sure that West had failed to maintain her lane. The Court of Common Pleas found that the evidence did not support a conviction for improper lane change, and the State entered a nolle prosequi on the charge. The case proceeded to trial solely on the basis of the DUI charge. A jury then convicted West of driving under the influence.
B. Officer Gaul’s Mistake of Fact was Reasonable
The “ultimate touchstone of the' Fourth Amendment is reasonableness.”[19] West’s seizure comports with the Constitution only if Officer Gaul had a reasonable and articulable suspicion that West was breaking the law when operating her vehicle. The “principal components” of that determination “will be the events which occurred leading up to the stop or search, and then the decision whether these historical facts, viewed from the standpoint of an objectivély reasonable police officer, amount to reasonable suspicion or to probable cause.”[20] Therefore, in evaluating a traffic stop, a reviewing court is not permitted to consider post-seizure facts. As this Court made clear in Jones v. State,[21] what- transpires after the stop “is not a proper factor in assessing the validity of a seizure.”[22]
When determining the constitutional reasonableness of a traffic stop the “actual motivations of the individual officers involved” are of no moment.[23] “[T]he fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer’s action does not invalidate the action taken as long as the‘circumstances, viewed objectively, justify that action.” [24] Accordingly, “[t]he foremost method of enforcing traffic and vehicle safety regulations .... is acting upon observed violations, which afford the quantum of individualized suspicion necessary to ensure-that police discretion is sufficiently constrained.”[25]
But “[t]o be reasonable is not to be perfect, and so the Fourth Amendment allows for some mistakes on the part of government officials, giving them ‘fair leeway for enforcing the law in the community’s protection.’ ”[26] As the United States Supreme Court observed in Heien, “[t]he Fourth Amendment tolerates only reasonable mistakes, and those mistakes — whether of fact or of law — must be objectively reasonable. We do not examine the sub *725 jective understanding of the particular officer involved.”[27] “Reasonable suspicion arises from the combination of an officer’s understanding of the facts and his understanding of the relevant law. The officer may be reasonably mistaken on either ground” when seizing an individual.[28] “The limit is that ‘the mistakes must be those of reasonable men.’ ”[29]
In my view, it would be objectively reasonable for a law enforcement official in Officer Gaul’s position to think that West had failed to remain within a single lane in violation of 21 Del. C. § 4122(1).[30] At a minimum, the record evidence, including the video recording of the incident, indicates that West tagged the fog and center lines on multiple occasions when traveling on Route 273. Prior to stopping West, the officer believed that he observed the vehicle leave its lane before making the sharp, corrective turn to avoid the median. Moreover, Officer Gaul testified that the video recording captured only a portion of the observable facts he relied upon in forming a reasonable suspicion that West had violated the law.
C. Reasonable Suspicion of Driving Under the Influence is Found by the Appellate Courts Only
The Superior Court affirmed the decision of the Court of Common Pleas on the basis of the community caretaker doctrine, but commented that West’s driving could give rise to a reasonable suspicion that a driver was impaired.[31] The Majority, without addressing the community caretaker doctrine, adopts the Superior Court’s reasonable suspicion of impairment comment and affirms on that basis.[32]
*726 Although it does not factor into our objective reasonableness, assessment, Officer Gaul never testified that he suspected West of driving under the influence. His testimony was that he suspected West was tired or otherwise in need of assistance. To date, this Court and the Superior Court have found weaving .within, one’s own lane sufficient to justify a stop, but only in combination with other observable facts, such as weaving across lanes, drifting onto the shoulder, committing multiple traffic violations, or nearly causing a collision with another motorist.[33] The Majority’s decision, therefore, breaks -new ground in holding that weaving within- a lane, accompanied by a sharp, corrective turn, can justify a traffic stop and investigation of the driver for driving under the influence.
Police officers have the expertise to “draw[] inferences and make[] deductions” that “might well elude an untrained person.”[34] In my view, Officer Gaul’s judgment, based on the observable facts preceding the seizure, that there was no reasonable suspicion of criminal conduct at the time of the stop — other than West’s failure to maintain her lane — was correct. The trial court similarly concluded that there was no basis for concluding prior to the stop that West was driving while intoxicated. The Majority states that our standard of review is de novo “to determine whether the totality of the circumstances, in light of the trial judge’s findings, support a reasonable and articulable suspicion for the stop.” But the- trial judge’s findings do not support the conclusion that there was reasonable suspicion that West was driving under the influence at the time of the stop.
D. Conclusion
Does a jerking of the wheel accompanied by some weaving within a lane now provide reasonable suspicion of driving under the influence? Are we now at risk of being stopped and investigated for driving under the influence if we weave within our lane while trying to find the defroster and jerk the wheel, or if we spill coffee on ourselves and swerve within our lane? Are we then subject to being pulled over and having to recite the alphabet from “E” to “P,” count backwards from 69, walk in a straight line while touching the heel of one foot to the toe of the other, and balance on one foot while keeping our hands at our sides?[35]
*727 “The States and the Federal Government have a ‘paramount interest ... in preservirtg the safety of ..; public highways.’ ”[36] “Alcohol consumption is a leading cause of traffic fatalities and injuries.”[37] Balancing-these important interests against our freedom to come and go without unreasonable interference is difficult, as this case surely illustrates. I believe that the officer’s instincts were correct and that his mistake of fact that West failed to remain within a single lane was reasonable, and I would affirm on that basis — not on the grounds of reasonable suspicion of driving under the influence. Unfortunately for West, the result is the-' same because, once she- was stopped, there were indicia of her intoxication that justified extending the investigation for driving under the influence. Accordingly, I concur in the judgment only.

. Heien v. North Carolina, — U.S. -, 135 S.Ct. 530, 536, 190 L.Ed.2d 475 (2014) (citing Brendlin v. California, 551 U.S. 249, 255-59, 127 S.Ct. 2400, 168 L.Ed.2d 132 (2007)).

. Id. (quoting Navarette v. California, — U.S. -, 134 S.Ct. 1683, 1687-88, 188 L.Ed.2d 680 (2014)).

. — U.S. -, 135 S.Ct. 530, 190 L.Ed.2d 475 (2014).

. Id. at 536.

. Navarette, 134 S.Ct. at 1687 (quoting United States v. Cortez, 449 U.S. 411, 417-18, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981)) (internal quotation marks omitted).

. See Florida v. J.L., 529 U.S. 266, 271, 120 S.Ct. 1375, 146 L.Ed.2d 254 (2000) (“The reasonableness of official suspicion must be measured by what the officers knew before they conducted their search.” (emphasis added)).

. The Majority appears to go even further than the arguments advanced by the State in its answering brief submitted to this Court. See Ans. Br. 15 ("Thus, immediately after the lawful stop, [Officer] Gaul was presented with additional facts supporting a reasonable belief that West was operating her motor vehicle while under the influence of alcohol. The continued investigation resulting in her arrest was justified.” (emphasis added)). The State seems to refrain from collapsing the pre- and post-stop events, and thus avoids the conclusion reached by the Majority that, prior to the stop, there was a reasonable basis to believe that West was impaired by alcohol. The State’s appropriately restrained position is also evident from its closing argument at trial, during which it stated: "Also[,] Corporal Gaul’s testimony wasn’t necessarily that he believed she was under the influence at that time. He just believed that there was something wrong and so he stopped in order to lend assistance. And at that point [,] once he spoke to the [d]defendant [,] it progressed into the DUI investigation." Transcript of Trial at 114, State v. West, Cr. ID. No. 1406017464 (Del.Com.Pl. Jan. 13, 2015) (emphasis added) (alterations added).

. Hiibel. v. Sixth Judicial Dist. Court of Nevada, 542 U.S. 177, 188, 124 S.Ct. 2451, 159 L.Ed.2d 292 (2004) (quoting Terry v. Ohio, 392 U.S. 1, 20, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)) (internal quotation marks omitted). The State acknowledges that ”[t]he duration and execution of a traffic stop is necessarily limited by the initial purpose of the stop.” Ans. Br. 14 (quoting Caldwell v. State, 780 A.2d 1037, 1047 (Del.2001)) (internal quotation marks omitted) (alteration added).

. The Superior Court found that "reasonable suspicion arose to justify continuing the traffic stop beyond the initial contact with [the defendant.” West v. State, 2015 WL 5121059, at *4 (Del.Super.Aug. 20, 2015) (emphasis added). Thus, its decision is more appropriately read to mean that a DUI investigation encompassing field sobriety tests was not justified based on the events leading up to the stop. Referring to West’s glassy, bloodshot eyes and the odor of alcohol when she spoke, the Superior Court concluded that "there was reasonable suspicion of [driving under the influence] to justify extending the stop to administer field sobriety tests.” Id. (emphasis added). I would not give its subsequent "note” that West’s conduct “could give rise to reasonable suspicion that the driver [wa]s impaired” such weight as to undercut its earlier, above-quoted analysis. Id. (citations omitted).

. 19 A.3d 287 (Del.2011); see also id. at 293 (holding that an odor of alcohol and a traffic violation, standing alone, do not constitute probable cause for a DUI). Here, we have no actual traffic violation, but rather weaving *721 within a marked lane and a mistaken view that West had failed to maintain that lane. This conduct violated no Delaware law, as the State ultimately agreed.

. Id. at 295 (citation omitted).

. See Rodriguez v. United States, — U.S. -, 135 S.Ct. 1609, 1614, 191 L.Ed.2d 492 (2015) (“Like a Terry stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure’s ‘mission’— to address the traffic violation that warranted the stop, and attend to related safety concerns.” (internal citations omitted)); id. ("Because addressing the infraction is the purpose of the stop, it may last no longer than is necessary to effectuate th[at] purpose." (internal quotation marks omitted) (internal citation omitted) (alteration in Rodriguez)); see also Florida v. Royer, 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (plurality opinion) ("The scope of the detention must be carefully tailored to its underlying justification.”).

. The officer may also check the driver’s license, determine whether there are outstanding warrants against the driver, and inspect the vehicle’s registration and proof of insurance. Rodriguez, 135 S.Ct. at 1615 (citing Delaware v. Prouse, 440 U.S. 648, 658-60, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979)) (internal citations omitted).

. Bloomingdale v. State, 842 A.2d 1212, 1219 (Del.2004).

. Id. at 1222 (emphasis added).

. I nonetheless agree with the Majority’s apparent reluctance to affirm on the basis of the community caretaker doctrine. That doctrine, prior to this case, has never been applied in Delaware to justify a stop of a moving vehicle. The community caretaker function, as described by the United States Supreme Court in Colorado v. Bertine, 479 U.S. 367, 107 S.Ct. 738, 93 L.Ed.2d 739 (1987), South Dakota v. Opperman, 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976), and Cady v. Dombrowski, 413 U.S. 433, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973), did not involve investigative stops and seizures. Rather, those cases involved the admissibility of incriminating evidence discovered during a standard police procedure of inventorying property that had been properly taken into custody. A majority of States appear to have adopted the community caretaker doctrine in some form. Many recognize, however, that the community care-taking function must be cautiously applied to minimize the risk of pretextual traffic stops. See, e.g., Trejo v. State, 76 So.3d 684, 689 (Miss.2011) (quoting State v. Rinehart, 617 N.W.2d 842, 844 (S.D.2000)) ("[C]ourts must carefully analyze the totality of the circumstances, so that the community caretaking function is cautiously and narrowly applied in order to minimize the risk that it will be abused or used as a pretext for conducting an investigatory [stop and] search for criminal evidence.” (internal quotation marks omitted) (alterations in Trejo and added)); State v. Rincon, 122 Nev. 1170, 147 P.3d 233, 237 (2006) ("In adopting the community caretaking doctrine, we reiterate that the exception will be narrowly applied and an inquiry stop is justified only where there are clear indicia of an emergency.” (citations omitted)).

. See, e.g., Charge History Record, State v. West, Cr. ID. No. 1406017464 (Del.Com.Pl. Mar, 31, 20IS) (identifying June 22, 2014 charge for failing to remain within a single lane); Information by the A.G., State v. West, Cr. ID. No. 1406017464 (Del.Com.Pl. Aug. 22, 2014) ("TRACEY N [sic] WEST, on or about the 22nd day of June, 2014, in the County of New Castle, State of Delaware, did operate a vehicle upon a public roadway which has been divided into two or more clearly marked lanes of traffic, and did fail to remain in her lane of travel until movement to another lane could be made with safety.”); Court Transfer Letter, State v. West, Cr. ID. No. 1406017464 (Del. J.P. Ct. July 9, 2014) ("Failed to remain within a single lane[,]”).

. A23; see also id, (Q. "Did she leave her "lane [when attempting to merge onto Route 1]?” A. “Yes, I believe she did.”); A24 (Q. “Is it your position that she leaves her lane as she’s turning onto the ramp?” A. “Well, it's a single lane, so, yes; I would say yes.”); A27 (Q. "Now is it your Contention that she drove on the line or over the line?" A. "You know, from what I saw,. I saw the spontaneous jerking back into the lane. I would say, you know, she came close to the line if not crossing it.”); A28 (Q. "Can we agree that the video shows that there’s a-gap between the markings on the lane and that concrete median?” A. "Yes.” Q. “Based on, if you can remember, on your knowledge and experience as a state trooper for ten years, can you tell us approximately how far away from the center median that line would be?” A. "I do not — you know, I can’t be exact. In an area like that[,] it’s maybe three or four feet. It’s not far.” Q. "Far enough for a tire to cross over without breáking the — ” A. "Yes.”); A35 (The Court: "Did you observe her actually depart from her lane of travel?” A, ('Well, from what I saw when the [sic ] merging onto Route 1 there and the turn which is in, I guess, dispute here, the sudden jerking because it was two lanes there where they came in, the turn lane from 273 westbound and also eastbound' had merged, It appeared that when she made that turn she turned a lot and then came back into her lane, alrriost striking the median.”).

. Riley v. California, — U.S.-, 134 S.Ct. 2473, 2482, 189 L.Ed.2d 430 (2014) (quoting Brigham City v. Stuart, 547 U.S. 398, 403, 126 S.Ct. 1943, 164 L.Ed.2d 650 (2006)) (internal quotation marks omitted); see also Wheeler v. State, 135 A.3d 282, 296 (Del.2016).

. Ornelas v. United States, 517 U.S. 690, 696, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996).

. 745 A.2d 856 (Del.1999).

. Id. at 862.

. Whren v. United States, 517 U.S. 806, 813, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996); see also Heien, 135 S.Ct. at 539 (citing Whren, 517 U.S. at 813, 116 S.Ct. 1769) ("We do not examine the subjective understanding of the particular officer involved..”).

. Whren, 517 U.S. at 813, 116 S.Ct. 1769 (quoting Scott v. United States, 436 U.S. 128, 138, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978)) (internal quotation marks omitted).

. Id. at 817-18, 116 S.Ct. 1769 (quoting Prouse, 440 U.S. at 654-55, 659, 99 S.Ct. 1391) (internal quotation marks omitted) (internal citations omitted) (alterations in Whren).

. Heien, 135 S.Ct. at 536 (quoting Brinegar v. United States, 338 U.S. 160, 176, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949)).

. Id. at 539 (citing Whren, 517 U.S. at 813, 116 S.Ct. 1769) (emphasis in original).

. Id. at 536.

. Id. (quoting Brinegar, 338 U.S. at 176, 69 S.Ct. 1302).

. 21 Del. C. § 4122(1) provides that, “[w]henever any roadway has been divided into 2 or more clearly marked lanes for traffic,” "[a] vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety.”

. The Superior Court commented that:
Although the Court [of Common Pleas] ... based its opinion on the community caretaker doctrine, we note that an officer’s observation of a vehicle weaving from side to side, albeit within a lane, and making sharp corrective turns to maintain the lane, for a distance of three to four miles at 2:00 a.m. could give rise to reasonable suspicion that the driver is impaired, and would justify initiating a traffic stop on the vehicle.
West, 2015 WL 5121059, at *4 (citations omitted).

. The Superior Court’s comment contains a footnote citing eleven cases. None is a decision by a Delaware court. Rather, they are decisions from Alaska, Arizona, Kansas, Minnesota, Nebraska, North Dakota, California, Florida, Illinois, Missouri, and Oregon. The decisions from other States generally support the proposition that weaving within a lane could justify an investigatory stop of a vehicle. But other cases hold that more is needed to justify an investigatory stop. See, e.g., Amundsen v. Jones, 533 F.3d 1192, 1199 (10th Cir.2008) ("There are limits, however, on the extent to which weaving can serve-as a factor creating reasonable suspicion of driving under the influence. For instance, an isolated incident of crossing into another lane will not ordinarily create reasonable suspicion of driving while impaired. Nor will weaving within a lane, without more, ordinarily create reasonable suspicion of driving under the influence.” (internal citations omitted)); Rowe v. State, 363 Md. 424, 769 A.2d 879 (2001) (reversing lower court decision that upheld a traffic stop where driver was "weaving off the highway” and where the officer stated that the incident occurred when it was late and at a time when "people are coming home from bars and are getting tired”).

. See, e.g., Malloy v. State, 462 A.2d 1088 (Del.1983) (upholding an .investigatory stop where police officers observed a "possible equipment defect” and saw the driver leave a tavern, make a "wide turn onto the road[,]” drive "erratically[,j” weave "across lanes and within [his] own lane for. lii miles”); State v. McNeil, 2012 WL 3834902 (Del.Super.Aug. 21, 2012) (finding that officers had reasonable suspicion that the driver of a vehicle was impaired where the officers observed the driver commit several minor traffic violations,.but decided to stop the vehicle after it swerved within its lane three to four times and drove with its turn signal on "for an extended period of time”); State v. Anderson, 2010 WL 4056130 (Del.Super.Oct. 14, 2010) (holding that an officer had a reasonable and articula-ble suspicion that a driver was engaged in conduct that could constitute a traffic offense where the driver, within the span of a one- and-a-half mile distance, "modestly” drifted out of his lane-on at least two occasions, made "several 'sharp' corrections in order to keep his vehicle within the designated lane markings[,]” and narrowly avoided striking another vehicle). Opinions of the Court of Common Pleas vary as to whether fact patterns involving weaving within a lane would support reasonable suspicion.

. Cortez, 449 U.S. at 418, 101 S.Ct. 690.

. See Transcript of Trial at 33-39, State v. West, Cr. ID. No, 1406017464 (Del.Com.Pl. Jan. 13, 2015) (indicating that Officer Gaul required. West to recite the alphabet from “E” to "P," count backwards from 69,. walk in a straight line while touching the heel of one foot to the toe of the other, and balance on *727 one foot while keéping her hands at her sides).

. Birchfield v. North Dakota, — U.S. -, -, 136 S.Ct. 2160, 195 L.Ed.2d 560, 2016 WL 3434398, at *19 (2016) (quoting Mackey v. Montrym, 443 U.S. 1, 17, 99 S.Ct. 2612, 61 L.Ed.2d 321 (1979)) (alterations in Birchfield).

. Id.